IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANTHONY FRANCOIS | § | |
| | § | |
| V. | § | 4:10cv837 |
| | § | |
| RICK THALER, | § | |
| DIRECTOR, TEXAS DEPARTMENT OF | § | |
| CRIMINAL JUSTICE - INSTITUTIONAL | § | |
| DIVISION | § | |

**PETITION FOR WRIT OF HABEAS CORPUS**
*28 U.S.C. § 2254* **- DEATH PENALTY**

TO THE HONORABLE DISTRICT COURT:

COMES NOW, Petitioner Anthony Francois, by and through his attorney of

record, Jani J. Maselli, and  presents this Amended Petition for Writ of Habeas

Corpus pursuant to *28 U.S.C. § 2254*.  In support, Mr. Francois shows the following:

I.

Mr. Francois was given 90 days from this filing date to amend this petition by

this honorable court.  This writ is timely if filed on or before June 7, 2010.   The

exhibits and affidavit filed in the original filing are incorporated by reference and will

not be refiled.

II.

Mr. Francois was charged by indictment with the offense of capital murder,

proscribed by Texas Penal Code § 19.03.  The indictment alleged that the petitioner

on or about September 11, 2003, did then and there unlawfully, during the same criminal transaction, intentionally and knowingly cause the death of Brittany Patterson by shooting Brittany Patterson with a deadly weapon, to-wit: a firearm, and intentionally and knowingly cause the death of Ashley Patterson by shooting Ashley Patterson with a deadly weapon, to-wit, a firearm.  (CRI 26).

A jury found Mr. Francois guilty of capital murder and answered the special issues in a manner resulting in a punishment of death.  (CR 849).  The conviction and sentence were affirmed on direct appeal to the Texas Court of Criminal Appeals on September 13, 2006, *Francois v. State*, No. 74984, 2006 WL 2615306 (Tex.Crim.App.2006)

Mr. Sidney Crowley  represented Mr. Francois at the state habeas level pursuant to Texas Code Crim. Proc. art. 11.071.  The writ was filed on January 23, 2006, in the 339th District Court, which forwarded the application to the Texas Court of Criminal Appeals.  No hearing was held on the writ in state district court, but the state habeas judge filed findings of fact and conclusions of law, recommending denying relief.  (Exhibit 1).  On March 11, 2009, the Texas Court of Criminal Appeals denied relief, in a brief unpublished opinion that adopted the trial court's findings and conclusions.  The entirety of the substantive findings by the Texas Court of Criminal Appeals was:

Applicant presents two allegations in his application in which he

2

challenges the validity of his sentence. The trial judge has entered findings of fact and conclusions of law and recommends that relief be denied. This Court has reviewed the record with respect to the allegations made by applicant. We agree with the trial judge's recommendation and adopt the trial judge's findings and conclusions. Based upon the trial court's findings and conclusions and our own review of the record, relief is denied.

*Ex parte Francois,* 2009 WL 624006, 1 (Tex.Crim.App. 2009).

Undersigned counsel was not appointed to represent Mr. Francois until August 28, 2009, in this federal proceeding.

## II.
## JURISDICTION

Mr. Francois invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 2254.

## III.
## CUSTODY

Mr. Francois is a citizen of the United States and a resident of the State of Texas. He is presently in the respondent's custody at the Polunsky Unit in Livingston, Texas, pursuant to a judgment of conviction and sentence of death.

## IV.
## STANDARD OF REVIEW

**Standard of Review: § 2254(e)(1) & § 2254(d)**

AEDPA provides standards for the review of the merits of Mr. Francois' claims

through the provisions of 28 U.S.C. §§ 2254(d) & 2254(e)(1):

28 U.S.C. § 2254(d) provides that:

(d) An application for a writ of habeas corpus . . . shall not be granted
with respect to any claim that was adjudicated on the merits in State
court proceedings unless the adjudication of the claim–
     (1) resulted in a decision that was contrary to or involved an
     unreasonable application of clearly established Federal law . . . ; or
     (2) resulted in a decision that was based on an
     unreasonable determination of the facts in light of the
     evidence presented in the State court proceeding.

It is important to note that § 2254(d) is a bar to the grant of habeas relief, rather than

to the Court's review.

Therefore, for the Court to apply § 2254(d), it must first determine whether Mr.

Francois' claims merit relief when reviewed *de novo*. Only then does the Court

examine whether relief is barred under § 2254(d). *See Ramdass v. Angelone*, 530

U.S. 156 (2000) and *Weeks v. Angelone*, 528 U.S. 225 (2000) (each thoroughly

discussing the merits of the claims prior to discussing the applicability of § 2254(d)).

28 U.S.C. § 2254(e)(1) provides that:

(e)(1) In a proceeding instituted by an application for a writ of habeas
corpus . . . a determination of a factual issue made by a State court shall
be presumed to be correct.  That Petitioner shall have the burden of
rebutting the presumption of correctness by clear and convincing
evidence.

The AEDPA's presumption of correctness is similar to that in previous law.  Prior to

the passage of the AEDPA, the law also provided that the federal courts were to presume state court fact findings correct, absent convincing evidence. *See Sumner v. Mata*, 440 U.S. 539, 550 (1981); *Bell v. Lynaugh*, 663 F.Supp. 405, 411 (E.D. Tex. 1987). The statute appears to be a codification of the Supreme Court's habeas jurisprudence in *Sumner*, and § 2254(e)(1) places no greater burden on a petitioner than existed prior to the enactment of the AEDPA.

Recently, in an unpublished opinion, the Fifth Circuit reversed a federal district court and explained what this standard is not:

> While *AEDPA review is highly deferential, we note that it is not perfunctory*. The Supreme Court has stressed that "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell* ( Miller-El I ), 537 U.S. 322, 340 (2003); *see also Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (AEDPA does not "prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which a principle is announced. The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner.") (internal quotation marks and citation omitted); *Taylor*, 529 U.S. at 377 (AEDPA "directs federal courts to attend to every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law.").(emphasis supplied).

*Hayes v. Thaler* , 2010 WL 183395, 2 (5th Cir. 2010)(not designated for publication). With this standard, Mr. Francois has raised claims sufficient to undermine the reasonableness of the facts and law in order to be granted relief.

## CLAIMS FOR RELIEF

Claim Number One: Mr. Francois was deprived of his Sixth Amendment right to the effective assistance of counsel at the punishment phase of his trial.

Claim Number Two: Mr. Francois received ineffective assistance of counsel repeatedly at trial.

Claim Number Three: The Texas Death Penalty Scheme violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution by failing to require that the State prove the lack of sufficient mitigating circumstances before the second special issue may be answered in the negative.

Claim Number Four: The Texas death penalty statute violates the Eighth Amendment because it fails to require that the [S]tate prove, beyond a reasonable doubt, that there is an absence of a circumstance that would justify a life sentence.

Claim Number Five: *Texas Code Criminal Procedure art. 37.071* failed to provide a method by which the [S]tate determines the death-worthiness of the defendant" and that "[t]he decision as to which defendant is to be subjected to the death penalty varies from county to county.

Claim Number Six: the Texas death-penalty statute is unconstitutional due to the jury's "inability to predict future dangerousness."

Claim Number Seven: The trial court violated his federal and state constitutional rights when it denied his "Motion to Declare the Texas Capital Sentencing Scheme Unconstitutional and Motion to Preclude Imposition of the Death Penalty."  Among the issues Mr. Francois presented on direct appeal were:  (1) the mitigation special issue was unconstitutional because it fails to place the burden of proof on the State regarding aggravating evidence; (2) the mitigation special issue was unconstitutional because it permits the very type of open-ended

discretion condemned by the United States Supreme Court in *Furman v. Georgia*; (3) *Article 37.071* was unconstitutional because it does not permit meaningful appellate review; (4) the definition of "mitigating evidence" was unconstitutional because it limits the concept of mitigation to factors that render a capital defendant less morally blameworthy for commission of the capital murder; (5) capital punishment as administered in Texas amounts to cruel and unusual punishment, according to Justice Blackmun's dissent in *Callins v. Collins*; (6) the "10-12 provision" in Article 37.071 violated the constitutional principles discussed in *Mills v. Maryland*, and *McKoy v. North Carolina*; and, (7) *Article 37.071* was unconstitutional because of its failure to inform the jury that a single holdout juror on any special issue resulted in a life sentence.

Claim Number Eight: The trial court erroneously overruled Petitioner's motion to preclude the State from seeking the death penalty. Mr. Francois argued at trial and on direct appeal that "[i]n view of the many different capital sentencing schemes that have been in operation in Texas in the post- *Furman* era, the Texas death penalty had been arbitrarily imposed and, thus, was unconstitutional under the 8th and 14th Amendments."

Claim Number Nine: The trial court commented on the weight of the evidence and demonstrated a bias in favor of the State during the prosecutor's questioning of LaKeyda Patterson at the punishment phase of the trial in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

Claim Number Ten: Mr. Francois received ineffective assistance of counsel on state habeas.

Claim Number Eleven: Mr. Francois was denied Due Process and a Fair Trial in state court.

*Overview*

Mr. Francois is a human being worthy of life.   He was conceived when his mother was 14 and she was raped.  (RR22 74-75).   His own father was imprisoned in Angola for rape and aggravated murder.   (RR22 74).   He was born deformed and ultimately his leg was amputated.   (RR22 76-78).   At school he was called "Crip," short for cripple.  (RR22 90).

His stepfather was abusive.  (RR22 60-74). He beat the mother repeatedly. (RR22 80).  His childhood was the type that should have resulted in removal from the family.  (RR22 60-74).   While it is apparent the jury rejected these cruel twists of fate for Mr. Francois, they are nonetheless compelling and paint the picture of who Mr. Francois is ... not just what the crime he was convicted of.

A brief summary of the facts of the offense were presented by the Texas Court of Criminal Appeals opinion:

> The State's evidence at the guilt stage showed that appellant became jealous of the interest that his teen-age girlfriend, Shemika, showed in another boy. He walked into Shemika's home at 2:00 a.m. one night with a gun, and confronted her mother, Sheila, in her bedroom. When Sheila ran screaming into the bedroom of her four daughters, appellant followed. He shot and killed Shemika's two youngest sisters, Ashley and Brittany, in their top bunk bed; he shot and killed her younger sister, Naikeshia, in another bed, and he shot-but did not kill-both Sheila and Shemika.

*Francois v. State,*  2006 WL 2615306, 1 (Tex.Crim.App. 2006).

Claim Number One: Mr. Francois was deprived of his Sixth Amendment right to the effective assistance of counsel at the punishment phase of his trial.

On state habeas, the issue raised rested on the fact that the defense called Jadon West to testify at punishment and he implicated Mr. Francois in drug trafficking. (State writ at 16-17). Mr. West's testimony hurt Mr. Francois. Although, Ms. Loretta Johnson Muldrow, trial attorney for Mr. Francois provided an affidavit at the state habeas level stating that this was a sound trial strategy in having Mr. West testify:

> After a review of the record, it is abundantly clear that the state's case on the merits was overwhelming against Mr. Francois. We were left with the arduous task of confronting the evidence in the punishment phase with the hope of attacking the state's witness' credibility and somehow lessen Applicant's culpability. Our investigation gave us info that Ms. Zachary was less than forthcoming. It was not enough to present to the jury that her former lover, Russell was a federal prisoner as a result of a drug conviction. Applicant provided us with the info, and West confirmed that Russell and Zachary conned them out of their proceeds from a conspiracy to deliver drugs. The jury was aware of the violent facts of the underlying offense, as well as Applicant's convictions for drug dealing. There was no additional harm to reveal the illicit nature of the existing relationship between Zachary, Russell, Francois, and West. The jury was made aware that Zachary did not reveal that she slept with a drug dealer, and if they believed (through West) that she was not a "random and innocent victim", Francois culpability in this offense could have been reduced (as it relates to their evidence of an extraneous aggravated robbery via home invasion).
>
> However, Francois' confessed culpability in the multiple homicide of the minor females in the instant case more than outweighed our reasonable strategy to reduce the weight of the state's evidence offered for the jury's consideration of the special issues as punishment by putting on, with Francois' request and approval Jadon West.

(State writ record at 78-79).

The findings by the trial court rejected this claim on state habeas, specifically

finding

> 12.  The Court finds, based on the trial record and the affidavit of trial counsel Loretta Muldrow, that the jury had already heard evidence that the applicant was convicted of two separate felonies involving possession of a controlled substance when Jadon West testified for the defense at punishment.
>
> 13.  The Court finds, based on the trial record and the affidavit of counsel Loretta Muldrow, that the defense adopted the strategy at punishment to attempt to reduce the weight of the State's punishment evidence against the applicant, including the applicant's 1991 robbery of Yvette Zachary; that the defense had investigated the facts surrounding the applicant's conviction for the Yvette Zachary robbery and determined that Zachary was not forthcoming and had actually "conned" West and the applicant out of the proceeds from a conspiracy to sell drugs; and, that the defense presented Jadon West's testimony at punishment in order to lessen the applicant's culpability with respect to that offense and dispel the impression that Zachary was a random innocent victim.  *See November 11, 2008 affidavit of trial counsel Loretta Muldrow.*
>
> 14.  Moreover, the Court finds, based on the affidavit of trial counsel Loretta Muldrow that trial counsel presented Jadon West as a witness for the defense at punishment at the applicant's request and with his approval of counsel's strategy.  *See November 11, 2008 affidavit of trial counsel Loretta Muldrow.*

(Exhibit 1).

There is no doubt that the crime was a difficult one to defend.  But Ms.

Muldrow's assertion that this somehow *helped* Mr. Francois defies credulity.  Further,

the assertion that somehow Mr. Francois agreed to this strategy has no basis in the

record.  Mr. Francois was entitled to effective assistance of counsel - especially at punishment.  Effective assistance of counsel is important at punishment because "the sentencing stage …is the time at which for many defendants the most important services of the entire proceeding can be performed." *Vela v. Estelle*, 708 F.2d 954, 964-965 (5th Cir. 1983) (internal quotation marks omitted).

The right to effective assistance of counsel is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. In *Strickland v. Washington,* 466 U.S. 668 (1984), the United States Supreme Court formulated a two prong test for determining whether trial counsel's performance was constitutionally inadequate.  First, the defendant must show that trial counsel's  performance was deficient. This requires proof that counsel made errors so serious that counsel was not functioning as the "counsel"guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. These errors must be so serious as to deprive the defendant of a fair trial whose result is reliable.  Unless the defendant makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable.  *Strickland v. Washington,* 466 U.S. at 687. Furthermore, such a showing must be made in light of all the circumstances. *Id.* at 690.

The *Strickland* standard lays the groundwork for how this court, and, indeed,

all courts measure the ineffectiveness of a trial or appellate attorney on post-conviction pleadings.  However inartful or unscientific the measurement is - by all standards, it is less than a preponderance of the evidence.  In *Strickland*, the test could not be clearer where the Court held:

> An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. **The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome**. (Emphasis supplied).

*Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. The findings by the trial court are unreasonable in light of the *Strickland* standard.  *See 28 U.S.C. § 2254.*

Many significant errors will not meet this "highly demanding" standard. *Kimmelman v. Morrison*, 477 U.S. 365, 381-382, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986).  But those errors, such as in Mr. Francois' case, that do require reversal, may not be because he was insularly deprived of some discrete and independent trial right, but because, as *Strickland* demands, they reflect performance by counsel that has "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S., at 686, 104 S.Ct., at 2064.

Factors that mitigate an individual defendant's moral culpability "ste[m] from

12

the diverse frailties of humankind."  *Woodson v. North Carolina*, 428 U.S. 280, 304,

96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976)(plurality opinion of Stewart, Powell, and

Stevens, JJ.). As the Supreme Court reasoned:

> "For the determination of sentences, justice generally requires
> consideration of more than the particular acts by which the crime was
> committed and that there be taken into account the circumstances of the
> offense together with the character and propensities of the offender."
> *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55, 58 S.Ct. 59, 61,
> 82 L.Ed. 43 (1937). Consideration of both the offender and the offense
> in order to arrive at a just and appropriate sentence has been viewed as
> a progressive and humanizing development. *See Williams v. New York*,
> 337 U.S., at 247-249, 69 S.Ct., at 1083-1084; *Furman v. Georgia*, 408
> U.S., at 402-403, 92 S.Ct., at 2810-2811 (Burger, C. J., dissenting).

*Woodson*, 428 U.S. at 304, 96 S.Ct. at 2991.

And especially at the punishment phase of the trial – in a case such as this

where there was a confession and eye witness testimony.  "The right to have the

assistance of counsel is too fundamental and absolute to allow courts to indulge in

nice calculations as to the amount of prejudice arising from its denial." *Glasser v.*

*United States*, 315 U.S., at 76, 62 S.Ct., at 467.

The constitutional right to counsel does not guarantee errorless counsel,

therefore, the effectiveness of counsel must be determined by the entire

representation.[1]  However, the "severity of the sentence" should "be considered in

---

[1]
    Although the entire representation must be reviewed, "the right to effective assistance of
counsel ... may in a particular case be violated by even an isolated error of counsel if that error is

13

determining whether counsel's performance meets this standard." *Vela v. Estelle*, 708

F.2d 954, 965 (5th Cir. 1983).

In *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999), the Fifth Circuit

explained that even a deferential review is subject to limitations:

> The Court is, therefore, **not required to condone unreasonable
> decisions parading under the umbrella of strategy, or to fabricate
> tactical decisions on behalf of counsel when it appears on the face of
> the record that counsel made no strategic decision at all**. Compare
> *Mann v. Scott*, 41 F.3d 968, 983-84 (5th Cir.1994) (citing record
> evidence for the proposition that counsel made a strategic decision not
> to offer mitigating evidence during the punishment phase of a capital
> trial), with *Whitley*, 977 F.2d at 157-58, (concluding from the record that
> counsel's failure to offer mitigating evidence during the punishment
> phase of habeas petitioner's capital trial was not the result of a
> considered strategic decision, and therefore not entitled to deference),
> and *Wilson*, 813 F.2d at 672, (concluding that the existing record was
> inadequate for purposes of determining whether counsel made a
> strategic decision not to offer mitigating evidence during the punishment
> phase of a capital trial or whether that decision was professionally
> reasonable); *see also Whitley*, 977 F.2d at 158 ("The crucial distinction
> between strategic judgment calls and plain omissions has echoed in the
> judgments of this court."); *Profitt v. Waldron*, 831 F.2d 1245, 1248 (5th
> Cir.1987) (Strickland 's measure of deference "must not be watered
> down into a disguised form of acquiescence."); id. at 1249 (refusing to
> indulge presumption of reasonableness as to "tactical" decision that
> afforded no advantage to the defense). Rather, the fundamental legal
> question is whether, viewed with the proper amount of deference,
> counsel's performance was professionally reasonable in light of all the
> circumstances. *Strickland*, 104 S.Ct. at 2066.

---

sufficiently egregious and prejudicial." *Murray v. Carrier*, 477 U.S. 478, 106 S. Ct. 2639, 2649-
2650, 91 L. Ed. 2d 397 (1986)." *Citing*, *United States v. Cronic*, 466 U.S. 648, 657, n.20, 104 S. Ct.
2039, 2046, n.20, 80 L. Ed. 2d 657 (1984).

The question becomes did the Petitioner receive a fair sentence resulting in a punishment verdict worthy of confidence. *cf. Kyles v. Whitley*, 514 U.S. 419 (1995).

Witnesses whose testimony could potentially damage the jury's image of the defendant should not be called to testify. Attorneys often refuse to present mitigating evidence in criminal trials when such evidence could be harmful to the defendant. *West v. Johnson*, 92 F.3d 1385, 1408–09 (5th Cir. 1996) (noting that mitigation evidence involving drugs is often a "two-edged sword."). Such decisions by defense attorneys have repeatedly been held to be reasonable in the context of an ineffective assistance of counsel claim. *Id.* at 1408 ("[T]he failure to present a case in mitigation during the sentencing phase of a capital murder trial is not, per se, ineffective assistance of counsel."). For example, in *Crane v. Johnson*, a capital case, defense counsel refused to put on mitigating evidence because "the evidence was potentially more harmful than helpful." 178 F.3d 309, 315 (5th Cir. 1999). Likewise, in *United States v. Drones*, the defendant's lawyer refused to present mitigation evidence that "could have opened the door to questions about [the defendant's] prior drug convictions." 218 F.3d 496, 501 (5th Cir. 2000). In both cases, the Fifth Circuit held that the attorneys' decisions were reasonable and that the attorney's performance was therefore effective. *Id.* ("Counsel's decision not to pursue evidence that could be

15

double-edged in nature [was] objectively reasonable and therefore does not amount to deficient performance." (internal quotations omitted)); *Crane*, 178 F.3d at 315.

Mr. Francois's trial attorneys did the exact opposite of what is considered reasonable. Here, Mr. West's testimony implicated Mr. Francois in a significant drug transaction. Despite the incredibly damaging nature of this testimony, Mr. Francois' attorneys nevertheless called Mr. West to testify during the sentencing phase of trial. Mr. West was supposedly called to impeach the testimony of Ms. Zachary. However, given that Ms. Zachary was known to consort with known drug dealers, Mr. Francois's trial attorneys could have impeached Ms. Zachary in a way that would not have highlighted Mr. Francois's involvement with narcotics to the jury. If refusing to proffer damaging evidence is *not* ineffective assistance of counsel, then choosing to proffer damaging evidence *is* ineffective assistance of counsel. Because of the damaging nature of Mr. West's testimony, choosing to call him during the sentencing phase of Mr. Francois's trial was unreasonable and thus ineffective.

Claim Number Two: Mr. Francois received ineffective assistance of counsel repeatedly at trial.

Although this issue was not presented on habeas, as demonstrated in Claim Number Ten, there were two areas that errors occurred during trial and no objections or erroneous objections were made.  First was the issue of judicial bias and the fact that *no* objection was made at all.  The Court of Criminal Appeals dismissed the claim of judicial bias despite the transcript clearly established the judge was assisting the prosecutor in the questioning of a key witness, LaKeyda Patterson.  Additionally, the victim impact evidence which was admitted through a non-victim was violative of the confrontation clause, yet that objection was not made.

This court has authority to hear these issues if Mr. Francois can establish sufficient "cause and prejudice" to hurdle the procedural exhaustion bar.  As the Fifth Circuit explained:

> To overcome the procedural bar, Smith must demonstrate cause for his default and actual prejudice or "show that the failure to consider his claims will result in a fundamental miscarriage of justice." *Elizalde v. Dretke*, 362 F.3d 323, 329 (quoting Beazley, 242 F.3d at 264). A showing of cause requires that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," such as "the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). As for prejudice, the petition must show "not merely that the errors ... created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his

17

> entire trial with error of constitutional dimensions." *Id.* at 493, 106 S.Ct.
> 2639 (internal quotations omitted). In his briefing to this court, Smith
> fails to fully address the exhaustion argument and thus, he fails to
> demonstrate cause and prejudice.

*Smith v. Quarterman*, 515 F.3d 392, 403 (5th Cir. 2008). Mr. Francois' claims of

ineffective assistance of counsel are apparent from the record. While he cannot

establish an outside influence, other than the poor performance by his state habeas

attorney to raise the issues, clearly there is a miscarriage of justice for this court *not*

to consider these claims.

Despite evidence of his guilt ... there was also evidence of the fact he had

suffered in his life. The balance between the two required Mr. Francois receive

effective assistance of counsel. From just the two examples cited in Claim Ten as

rejected by the Court of Criminal Appeals, such a miscarriage of justice is presented.

Defense counsel should object when a trial judge shows bias and when the

prosecution introduces victim impact evidence from a non-victim. A failure to object

may be reasonable if the omission was for a strategic purpose. "Whether counsel's

omission served a strategic purpose is a pivotal point in *Strickland* and its progeny."

*Loyd v. Whitley*, 977 F.2d 149, 158 (5th Cir. 1992) (citing *Strickland*, 466 U.S. at

691; *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986)). Mr. Francois' attorneys'

failure to object at trial was not a tactical or strategic decision.  As a result, Mr.

Francois' trial attorneys rendered constitutionally ineffective assistance.

In the Fifth Circuit, "[t]he crucial distinction between strategic judgment calls

and plain omissions" is a critically important issue in the context of a *Strickland*

ineffective assistance of counsel analysis.  *Id.*  (citing *Profitt v. Waldron*, 831 F.2d

1245, 1249 (5th Cir. 1987) (where counsel's omission presented "no advantage" to

the defense, the court refused to accord "our usual deference to tactical decisions");

*Nealy v. Cabana*, 764 F.2d 1173 (5th Cir. 1985); *Cook v. Lynaugh*, 821 F.2d 1072,

1078 (5th Cir. 1987) (finding ineffective assistance with emphasis on fact that failure

to investigate was not a strategic choice).  In *Loyd*, the Fifth Circuit held "that

counsel's performance was not professionally reasonable" because the trial lawyer's

omission was not a strategic decision.  *Id.* at 159.  The court noted, "Counsel did not

choose, strategically or otherwise, to pursue one line of defense over another.

Instead, [he] simply abdicated his responsibility to advocate his client's cause."  *Id.*

(internal quotations omitted).

Failure to properly object at trial, thereby forfeiting a defendant's right to

complain on appeal, is an omission that can justify an ineffective assistance claim.

*Vela v. Estelle*, 708 F.2d 954, 966 (5th Cir. 1983).  As detailed above, this is

especially true when counsel's omission is not strategic but instead counsel has

"simply abdicated his responsibility to advocate his client's cause." *See Loyd*, 977 F.2d at 159.  In *Vela*, the defendant's trial counsel failed to properly object to highly prejudicial testimony.  *Vela*, 708 F.3d at 962.  Those general objections failed to preserve error for appeal.  *Id.* at 966.  As a result of those omissions, the Fifth Circuit held that the defendant's counsel "did not render reasonably effective assistance." *Id.* at 965.  After finding ineffective assistance, the court moved on to the defendant's next hurdle—determining whether the error was sufficient to justify habeas relief.

Once a court determines that counsel's performance is ineffective, the court "should then separately determine whether petitioner suffered prejudice of sufficient magnitude to warrant granting the writ of habeas corpus."  *Id.* (quoting *Washington v. Strickland*, 693 F.2d 1243, 1258 (5th Cir. 1982).  Habeas relief is appropriate when the defendant can show not only that the ineffective assistance "created a possibility of prejudice, but that [it] worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Murray v. Carrier*, 477 U.S. 478, 494 (1986).  The *Vela* court decided that this "prejudice" standard had been met based upon defense counsel's omissions during trial.  *Vela*, 708 F.3d at 966.  The court noted three consequences resulting from defense counsel's failure to object:

> Vela was thrice prejudiced. First, defense counsel allowed the prejudicial evidence on Brown's good character to be introduced. Second, by failing to object to it and ask for a curative instruction,

counsel allowed the jury to consider it as if it had been material, probative evidence, relevant to the issue of Vela's sentence. Third, defense counsel's failure to object waived the issue for consideration on direct appeal. We have no difficulty concluding that counsel's ineffectiveness "resulted in actual and substantial disadvantage to the cause of [Vela's] defense." *Strickland*, 693 F.2d at 1262. Indeed, given the extremely prejudicial effect of this testimony, we fail to see how anyone could conclude otherwise.

*Id.* Ultimately, the Fifth Circuit granted Vela's request for habeas relief due to his counsel's omissions. *Id.*

Mr. Francois' case is virtually identical to *Vela*. Here, Mr. Francois' trial counsel failed to properly object to the judicial bias issue and the introduction of victim impact testimony from Ms. Frank. These omissions were not strategic decisions and ultimately amounted to ineffective assistance of counsel. By failing to properly object to these issues, the jury was led to believe that the testimony was material, probative evidence and that the trial court was partial to the State proving its case. Like *Vela*, these omissions also failed to preserve the errors for appeal. As a result, they worked an actual and substantial disadvantage to Mr. Francois during his trial. Accordingly, Mr. Francois' request for habeas relief should be granted.

Claim Number Three: The Texas Death Penalty Scheme violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution by failing to require that the State prove the lack of sufficient mitigating circumstances before the second special issue may be answered in the negative.

On state habeas Mr. Francois raised this claim under the *Apprendi/Ring* rubric of cases. This issue, Mr. Francois concedes, has been repeatedly rejected by the Fifth Circuit. However, that does not undermine this court's ability to evaluate the law and the claim to determine whether this finding is unreasonable in light of the law and the unique facts in this case.

The basis of the motion rested on the fact that *Apprendi v. New Jersey*, 120 S.Ct. 2348 (2000) requires that any fact other than a prior conviction that increases the maximum punishment for a crime must be charged in the indictment and submitted to the jury and proven beyond a reasonable doubt. The indictment in the case *sub judice* did not contain any allegation that there was a probability that Appellant would commit future acts of violence and would constitute a continuing threat to society.

Alternatively, under *Bush v. Gore*, 121 S.Ct. 525 (2000), the death penalty should have been precluded. Mr. Francois raised this issue to the trial court (CR 454) and to the Court of Criminal Appeals which rejected it without explanation. Article I, Section 1 of the Texas Constitution divides the government into three departments:

Legislative, Executive, and Judicial.  In giving the prosecutor the direction to seek death in a capital case, there has been an unconstitutional delegation of authority to the judicial branch.  Further, by allowing the prosecutors in each of the 254 counties of the State to develop their own system for determining whether or not to seek death, the imposition of the death penalty is arbitrary and capricious in violation of the Eighth Amendment.  *See Gregg v. Georgia*, 428 U.S. 153, 192 (1976).  This procedure also denies those charged with capital offenses the equal protection under the law as a defendant charged with capital murder  under the same fact situation might face a death prosecution if prosecuted in Harris County, but face a non-death capital prosecution in another county.  *Bush v. Gore*, 121 S.Ct. 525, 534-537 (2000).

To impose capital punishment on a defendant, a state "'has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.'"  *Martin v. Maggio*, 711 F.2d 1273, 1284 (5th Cir. 1983) (quoting *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).  "[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  *Gregg v. Georgia*, 428 U.S. 153, 189.  Thus, a state's capital sentencing scheme must provide "a meaningful basis for distinguishing the few cases in which

[the penalty] is imposed from the many cases in which it is not." *Id.* at 188 (quoting

*Furman v. Georgia*, 408 U.S. 238, 313 (White, J. concurring).  According to the

Supreme Court:

> This means that if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates "standardless [sentencing] discretion." *Gregg v. Georgia*, supra, at 196, n. 47. *See also Proffitt v. Florida*, 428 U.S. 242; *Jurek v. Texas*, 428 U.S. 262. It must channel the sentencer's discretion by "clear and objective standards" that provide "specific and detailed guidance," and that "make rationally reviewable the process for imposing a sentence of death." As was made clear in *Gregg*, a death penalty "system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* could occur." 428 U.S., at 195, n. 46.

*Godfrey*, 446 U.S. 420, 428 (1980) (internal footnotes omitted).  The ability of the

prosecutors in each of Texas' 254 different counties to develop their own methods for

deciding when to seek the death penalty allows "arbitrary and capricious" imposition

of the death penalty in Texas.

24

Claim Number Four: The Texas death penalty statute violates the Eighth Amendment because it fails to require that the [S]tate prove, beyond a reasonable doubt, that there is an absence of a circumstance that would justify a life sentence.

Claim Number Five: *Texas Code Criminal Procedure art. 37.071* failed to provide a method by which the [S]tate determines the death-worthiness of the defendant" and that "[t]he decision as to which defendant is to be subjected to the death penalty varies from county to county.

These issues were rejected by the Texas Court of Criminal Appeals. *See Francois*, 2006 WL 2615306 at *1. The reasoning for the issues and rejections were based upon the previous issue under *Apprendi/Ring*. The Court stated that the issue raised by Mr. Francois did not persuade the Court to reconsider previous holdings denying this claim.

However, there are other considerations. The Texas capital punishment statute provides that if a jury fails to reach agreement at punishment, even if there is only one juror voting in contradiction to the others, the trial court will automatically sentence the defendant to life imprisonment. Article 37.071, §2(g), Texas Code of Criminal Procedure. However, the statute also provides that the jury cannot be informed of this provision of the law. Article 37.071, §2(a), *supra*. So Mr. Francois' jury was not informed that if they failed to agree on punishment, Mr. Francois would be sentenced to life imprisonment, rather than a mistrial resulting in a new trial.

25

This statutorily-required ignorance on the part of the jury violates the Eighth and Fourteenth Amendments to the Constitution, because it creates pressure on uninformed jurors who might vote for life instead to vote with the majority for death. A jury that is not fully informed of relevant law is not reaching a proper verdict, resulting in cruel and unusual punishment and denial of due process of law. *See, Caldwell v. Mississippi*, 105 S.Ct. 2633, 2639-46 (1985) (the Eighth Amendment is violated if a capital sentencing jury is not informed of relevant state sentencing law).

Given Mr. Francois' evidence at punishment regarding his troubled youth and the age he was at the time of the trial, it is likely that at least one juror would have voted (at least initially) in favor of a life sentence rather than death. But not having been informed of the consequences of a hung jury, that juror would believe that such a result would result in a mistrial and new trial. This misperception would exert pressure on the juror to vote with the majority and reach a unanimous result. This "life" juror, it must be remembered, would already have found Mr. Francois guilty of capital murder, and would not want that verdict to disappear. He or she would also be likely to believe that, given an eleven to one majority, the next jury would both find Mr. Francois guilty and answer the special issues in a way resulting in a death sentence. So the juror would give up his or her position and vote in favor of death, not realizing that his or her non-death vote could be given effect if he or she would

refuse to give in.  Under Texas law, this situation would result in a failure to reach unanimity and an automatic life sentence.  But the jurors would not know that.  The statute specifically requires that they be kept in ignorance.

This instruction violates the Eighth Amendment's ban on cruel and unusual punishment.  *See, Caldwell v. Mississippi*, *supra.* (Eighth Amendment violated if capital sentencing jury is not informed of relevant state sentencing law).  To establish a *Caldwell* violation, the defendant must show that the instructions to the jury improperly described the applicable law. *Dugger v. Adams*, 109 S.Ct. 1211, 1215 (1989).  In this case the instructions failed to inform the jury of that applicable law.

Because of this constitutional violation, Mr. Francois' conviction and sentence of death must be vacated and the cause remanded for a new trial.  Alternatively, Mr. Francois' sentence of death should be vacated and a life sentence entered.

As presented in Claim Three, this issue does have merit and the findings are unreasonable in light of the law and the facts.

Claim Number Six:  the Texas death-penalty statute is unconstitutional
due to the jury's "inability to predict future dangerousness."

This issue was rejected by the Court of Criminal Appeals on direct review. *See Francois*, 2006 WL 2615306 *1.  However, this type of issue is exactly the type of claim that is cognizable on review.   As detailed in the motion regarding this issue, the ability to determine "future dangerousness" is fraught with peril. (CR 466-469). The unreliability of psychiatric predictions of long term future dangerousness is by now an established fact within the profession. *American Psychiatric Association Task Force on Clinical Aspects of the Violent Individual,* 'Clinical Aspects of the Violent Individual" (1974) and *Amicus Brief of the American Psychiatric Association (APA) in Barefoot v. Estelle*, (1983).  The APA, in its brief, determined that the primary finding of the task force was that judgments concerning the long-run potential for future violence and the dangerousness of a given individual are "fundamentally of very low reliability" adding that the state of the art regarding predictions of violence is very unsatisfactory.  (CR 467).

Claim Number Seven: The trial court violated his federal and state constitutional rights when it denied his "Motion to Declare the Texas Capital Sentencing Scheme Unconstitutional and Motion to Preclude Imposition of the Death Penalty."

Among the issues Mr. Francois presented on direct appeal were: (1) the mitigation special issue was unconstitutional because it fails to place the burden of proof on the State regarding aggravating evidence; (2) the mitigation special issue was unconstitutional because it permits the very type of open-ended discretion condemned by the United States Supreme Court in *Furman v. Georgia*; (3) *Article 37.071* was unconstitutional because it does not permit meaningful appellate review; (4) the definition of "mitigating evidence" was unconstitutional because it limits the concept of mitigation to factors that render a capital defendant less morally blameworthy for commission of the capital murder; (5) capital punishment as administered in Texas amounts to cruel and unusual punishment, according to Justice Blackmun's dissent in *Callins v. Collins*; (6) the "10-12 provision" in Article 37.071 violated the constitutional principles discussed in *Mills v. Maryland*, and *McKoy v. North Carolina*; and, (7) *Article 37.071* was unconstitutional because of its failure to inform the jury that a single holdout juror on any special issue resulted in a life sentence.

In a recent case, the Supreme Court addressed the evolving standards surrounding the Eight Amendment by stating:

> The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." To determine whether a punishment is cruel and unusual, courts must look beyond historical conceptions to "'the evolving standards of decency that mark the progress of a maturing society.'" *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958) (plurality opinion)). "This is because '[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change.'" *Kennedy v. Louisiana*, 554 U.S. ___, ___, 128 S. Ct. 2641, 2649, 171 L. Ed. 2d 525, 538 (2008) (quoting *Furman v. Georgia*, 408 U.S. 238, 382, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (Burger, C. J., dissenting)).

*Graham v. Florida*, 560 U.S. ___, ___, 2010 U.S. LEXIS 3881, at *18 (U.S. May 17, 2010).

Claim Number Eight: The trial court erroneously overruled Petitioner's motion to preclude the State from seeking the death penalty. Mr. Francois argued at trial and on direct appeal that "[i]n view of the many different capital sentencing schemes that have been in operation in Texas in the post- *Furman* era, the Texas death penalty had been arbitrarily imposed and, thus, was unconstitutional under the 8th and 14th Amendments."

Mr. Francois understands that these multi-death penalty attack issues may seem foreclosed under current law.  Both of these issues were rejected by the Texas Court of Criminal Appeals on direct review.  *See Francois*, 2006 WL 2615306 at *1-2.  The issues were summarily rejected despite intense constitutional arguments at the trial court by motion and on direct appeal.  However, Mr. Francois believes each and every one of these issues and sub-issues has merit.

While Mr. Francois acknowledges that the current posture of this circuit with regard to his legal issues is not in his favor, Mr. Francois requests that this Court examine his issues on their merit.  "Lest it be forgotten, [d]eath, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson*, 428 U.S. at 305.  The Constitution itself requires careful review of Mr. Francois' death sentence.  The reality is the law is ever evolving.  Indeed, "[t]he genius of the Constitution resides not in any static meaning

31

that it had in a world that was dead and gone, but in its adaptability to interpretations

of its greatest principles that cope with current problems and current needs." William

J. Brennan, Constitutional Adjudication, 40 Notre Dame Law, 559, 568 (1965).

In *Atkins v. Virginia*, 122 S.Ct. 2242 (2002), the Supreme Court considered the

issue of whether executing the mentally retarded violated the Eighth Amendment.

Prior to their decision, the issue was foreclosed.  In reversing precedent, the Court

noted:

> A claim that punishment is excessive is judged not by the standards that
> prevailed in 1685 when Lord Jeffreys presided over the "Bloody
> Assizes" or when the Bill of Rights was adopted, but rather by those that
> currently prevail. As Chief Justice Warren explained in his opinion in
> *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958): "The
> basic concept underlying the Eighth Amendment is nothing less than the
> dignity of man. ... The Amendment must draw its meaning from the
> evolving standards of decency that mark the progress of a maturing
> society." Id., at 100-101, 78 S.Ct. 590.

*Atkins*, 122 S.Ct. at  2247.  If Mr. Atkins had chosen to not present the argument,

clearly foreclosed to him at the time he asserted it, he would most likely have been

executed by now.  The evolving standards that Mr. Chief Justice Warren wrote of in

*Trop* in 1958  continue today:

> The exact scope of the constitutional phrase 'cruel and unusual' has not
> been  detailed by this Court.  But the basic policy reflected in these
> words is firmly established in the Anglo-American tradition of criminal
> justice. The phrase in our Constitution was taken directly from the
> English Declaration of Rights of 1688,  and the principle it represents

can be traced back to the Magna Carta.  The basic concept underlying
the Eighth Amendment is nothing less than the dignity of man. While
the State has the power to punish, the Amendment stands to assure that
this power be exercised within the limits of civilized standards.
(footnote omitted).

*Trop v. Dulles*, 356 U.S. 86, 99-101, 78 S.Ct. 590, 597-98 (1958).  The evolving

standards of decency mandate Mr. Francois present this issue – and that this

Honorable Court consider the same, although seemingly foreclosed.

1.    *Article* 37.071 § 2(a)

       Texas law requires that neither the court, the state, nor counsel for the defense

may inform a juror or prospective juror of the effect of the jury's failure to agree on

special issues at punishment.  *Tex. Code Crim. Proc. Ann. art. 37.071 § 2(a)*(Vernon

Supp. 1997).  All parties in Mr. Francois' case acted in compliance with this statute.

2.    *Article 37.071 §§ 2(d)(2) & 2(f)(2)*

       Texas law requires that the capital sentencing jury be instructed that it may not

answer the first special issue "yes" or the second special issue "no" unless 10 or more

jurors agree.  *See* Tex. Code Crim. Proc. Ann. art. 37.071 §§ 2(d)(2) & 2(f)(2).  Mr.

Francois' jury was instructed pursuant to the statute.  (CR 839).

3.    *The Law*

       The Court of Criminal Appeals, in rejecting variants of this argument during

the last few years, has erred.   Essentially, the "10-12 rule" contained in

Tex.Crim.Proc. Art. 37.071 violates the constitutional principles discussed in *Mills v. Maryland*, 486 U.S. 367 (1988), and *McCoy v. North Carolina*, 494 U.S. 294 (1990).

The "10-12 provision" in Art. 37.071, § 2(d)(2) & § 2(f)(2), violates the constitutional principles discussed in *Mills* and *McCoy* for the following reasons. The "10-12 provision" requires that, in order for the jury to return answers to the special issues that would result in a life sentence, (I) at least ten jurors must vote "no" in answering the first special issue, (ii) at least ten jurors must vote "no" in answering the second special issue, *or* (iii) at least ten jurors must vote "yes" in answering the third special issue. This "10-12 provision" violates the Eighth and Fourteenth Amendments because there is a reasonable possibility that, under the present Texas capital sentencing scheme, all twelve jurors in a capital case could believe that a life sentence would be appropriate under state law, but, because at least ten jurors could not collectively agree on their answer to any one of the special issues, the jury could not return a life sentence. Such a "majority rules" mentality could lead jurors to change their potential holdout votes for life to a vote for the death penalty.

As an illustration, consider the following hypothetical circumstance: at trial, four of the twelve jurors conclude that, as a consequence of a capital defendant's positive character traits, he would not pose a future threat to society; thus, those

34

jurors individually vote to answer the first special issue negatively.[2]  Assume that those four jurors also believe, however, that the defendant possessed the requisite *mens rea* under the second special issue (the "parties" special issue) and that there is insufficient mitigating evidence as a whole to result in an affirmative answer to the third special issue.

Further, suppose that four other jurors believe that the same capital defendant did not possess the requisite *mens rea* under the second special issue and, thus, those four jurors individually vote to answer the parties special issue negatively.[3]  Assume, however, that those four jurors believe that the capital defendant does pose a future danger to society and that those four jurors also believe that the defendant's mitigating evidence, as a whole, is insufficient to result in a "no" vote to the mitigation special issue.

Finally, suppose that the four remaining members of the jury conclude, as a result of the capital defendant's mitigating evidence of a troubled childhood, that the mitigation special issue should be answered affirmatively.  However, for whatever

---

[2] Of course, a "no" answer to the "future dangerousness" special issue -- a finding that a capital defendant does not pose a future threat to society -- is a constitutionally recognized mitigating factor.  *See Franklin v. Lynaugh*, 487 U.S. 164 (1988); *Skipper v. South Carolina*, 476 U.S. 1 (1986).

[3] A capital defendant's lack of such a mens rea is, of course, a constitutionally relevant circumstance.  *Cf. Tison v. Arizona*, 481 U.S. 137 (1987).

reason, assume that those four jurors also believe that the capital defendant would pose a future threat to society and also that the defendant possessed the requisite *mens rea* under the "parties" special issue.  Thus, those four remaining jurors only vote in the defendant's favor on the third special issue.

Hypothetically speaking, all twelve members of the jury in such a case individually agree that *one of the three statutory mitigating factors* has been established and that, under state law, a life sentence is appropriate.  That is, all twelve jurors could have believed that a mitigating factor exists which, under state law, should have caused the capital defendant to be sentenced to life.  However, jurors are given the impression that Texas law forbids the imposition of a death sentence *only if* ten members of a capital sentencing jury agree collectively as to *which* statutory mitigating factor has been established; because such jurors could disagree about which of the three factors has been established, however, they are left without guidance as to how to proceed.  In the absence of such guidance, there is a constitutionally unacceptable risk that Texas capital sentencing juries may feel coerced by a "majority rules" mentality into returning answers to the special issues that would result in a death sentence.  A death sentence imposed by a jury so instructed is too likely a product of arbitrary decision-making for the Constitution to tolerate.  *See McKoy v. North Carolina, supra; Mills v. Maryland, supra.*

Claim Number Nine: The trial court commented on the weight of the evidence and demonstrated a bias in favor of the State during the prosecutor's questioning of LaKeyda Patterson at the punishment phase of the trial in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

The Court of Criminal Appeals denied this claim because it was unpreserved. *See Francois*, 2006 WL 2615306 at *6-7. There was no discussion of the bias the court displayed in actually assisting the prosecution in asking the *right* question that would not be objectionable. (Detailed in Claim Number Ten below).

The Due Process Clause guarantees criminal defendants the right to a fair and impartial trial. *Richardson v. Quarterman*, 537 F.3d 466, 474 (5th Cir. 2008) (citing *Bracy v. Gramley*, 520 U.S. 899, 117 S. Ct. 1793, 1797 (1997). A fair and impartial trial "fundamentally means a trial before an impartial judge . . . ." *United States v. Lanham*, 416 F.2d 1140, 1144 (5th Cir. 1969). "Therefore, any judicial officer incapable of presiding in such a manner violates the due process rights of the party who suffers the resulting effects of that judicial officer's bias." *Bigby v. Dretke*, 402 F.3d 551, 558 (5th Cir. 2005).

The importance of an impartial judiciary is repeatedly expressed by courts. *United States v. Jordan*, 49 F.3d 152, 155 (5th Cir. 1995). "[F]airness requires an absence of actual bias or prejudice in the trial of the case." *Id*. (internal quotation marks omitted). While the right to an impartial trial is fundamental to the defendant,

37

"fundamental to the judiciary is the public's confidence in the impartiality of our judges and the proceedings over which they preside." *Id.*  As is said, "Justice must satisfy the appearance of justice." *Id.* (quoting *In re Murchison*, 349 U.S. 133, 136 (1954).  Thus, "avoiding the appearance of impropriety is as important in developing public confidence in our judicial system as avoiding impropriety itself. *Id.* at 155–56.

To ensure a constitutionally fair trial, a trial judge "must not assume the role of prosecutor or defender." *Ruiz v. Estelle*, 679 F.2d 1115, 1129 (5th Cir. 1982).  In fact, "[h]e must avoid even the appearance of favoring one side." *Id.*  While a court may call or question witnesses, "in so doing the court should be careful to preserve an attitude of impartiality and guard against giving the jury any impression that the court was of the opinion that defendant was guilty." *Lanham*, 416 F.2d at 1144.  This is because "[t]he opinion of the judge, on account of his position and the respect and confidence reposed in him and in his learning and assumed impartiality, is likely to have great weight with the jury." *Id.*

Under Texas, law, judges are required to adhere to the Code of Judicial conduct, which contains pertinent provisions you should consider citing, to wit:

(1) Canon 1, which provides:

> An independent and honorable judiciary is indispensable to justice in our society.
> A judge should participate in establishing, maintaining and enforcing high standards of

conduct, and should personally observe those standards so that the integrity and independence of the judiciary is preserved. The provisions of this Code are to be construed and applied to further that objective;

(2) Canon 2, which provides, in pertinent part:

A. A judge shall comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary; and

(3) Canon 3, which provides, in pertinent part:

B. Adjudicative Responsibilities.

(1) A judge shall hear and decide matters assigned to the judge except those in which disqualification is required or recusal is appropriate.

(4) A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity, and should require similar conduct of lawyers, and of staff court officials and others subject to the judge's direction and control.

(5) A judge shall perform judicial duties without bias or prejudice.

(6) A judge shall not, in the performance of judicial duties by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status, and shall not knowingly permit staff, court officials and others subject to the judge's direction and control to do so.

(9) A judge should dispose of all judicial matters promptly, efficiently and fairly.

Consistent with the provisions of Canons 1,2 and 3 of the Code of Judicial Conduct quoted above, a judge must be particularly careful in what he or she does and/or says, because "[t]he influence of the trial judge on the jury is necessarily and properly of great weight and his lightest word or intimation is received with deference, and may prove controlling." *Newman v. A.E. Staley Wg. Co.*, 648 F.2d 330 at 334 (5th Cir. 1981) (*quoting Quercia v. United States,* 289 U.S. 466 (1933)). Indeed, "Jurors hold the robed trial judge in great awe and reverence' and 'his lightest word or intimation is received with deference, and may prove controlling.'" *United States v. Barbour*, 420 F.2d 1319, 1322 (D.C.Cir.l969) (*quoting Hawkins v. UnitedStates,* 3l0F.2d8 49,852( D.C.Cir.l962),and *Starr v United States*, l53U.S. 614, 626( 1894).

Indeed, every citizen accused is guaranteed the right to an impartial judge who is not biased. *See Johnson v. Mississippi*, 403 U.S. 212, 216 (1971) (per curiam) ("Trial before 'an unbiased judge' is essential to due process"); Brown v. Vance,637 F.2d 272,281 (5th Cir. 1981) ("(D)ue process guarantee(s).. . a fair trial before an impartial judge...."). Indeed, as stated in *Bracy v Gramley*,8l F.3d 684, 696 (7th Cir. 1996)(Rovner,J ., dissenting):

> No right is more fundamental to the notion of a fair trial than the right to an impartial judge. *Johnson v. Mississippi* 403 U.S. 212, 216,91 S.Ct. 1778, 1780, 29 L.Ed.2d 423 (1971) (per curiam); *In re Murchison*,349 U.S. 133, 136,75 S.Ct. 623,625, 99 L.Ed. 942 (1955); *see also Aetna Life Ins. Co. v. Lavoie,*475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed2d 823 (1986); *Ward v. Village of Monroeville, Ohio*,409 U.S. 57,93 S.Ct. 80, 34 L.Ed.2d 267 (1972); Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 7l L.Ed. 749 (1927). 66The truth pronounced by Justinian more than a thousand years ago, that '[i]mpartiality is the life of justice,' is

> just as valid today as it was then.' (*United States v. Brown*, 539
> F .2d 467 , 469 (5th Cir. 1976) (per curiam). The constitutions
> of our nation and of our states, the rules of evidence and of
> procedure, and 200 years of case law promise a full panoply of
> rights to the accused. But ultimately the guarantee of these rights
> is no stronger than the integrity and fairness of the judge to
> whom the trial is entrusted. (emphasis added).

Mr. Francois was denied his constitutional right to a fair and impartial trial. By assisting the prosecution during Mr. Francois' trial, the judge "assume[d] the role of prosecutor" and appeared, to the jury, to favor the State's case.  If jurors believed that the judge was favorable the State's case, it would be harder for them to give credence to the presumption of innocence.  Because juries are highly sensitive to the conduct of judges, the bias shown by Mr. Francois' trial judge likely had a severe impact on the jury.  The assistance given to the prosecutor in Mr. Francois' case violated his due process rights by denying him his constitutional right a fair and impartial trial.

The record does establish a bias on the part of the judge to assist the state. Under the cause and prejudice standard for unexhausted claims, a miscarriage of justice can hurdle any procedural bar.  Mr. Francois has met that standard.

> Claim Number Ten: Mr. Francois received ineffective
> assistance of counsel on state habeas.

Mr. Francois recognizes this claim has been repeatedly foreclosed by the courts. However, issues that *could* have been raised from the *record* itself were ignored. Indeed, Mr. Crowley raised two claims in 24 pages. He was paid $9100. The issue raised in Claim Nine, *supra*, is an excellent issue that was raised on direct appeal. The Court of Criminal Appeals dismissed it because there was no objection. This court might well dismiss it as procedurally defaulted. It is currently settled law that ineffectiveness of state habeas counsel furnishes no basis for cause to excuse a procedural default. *See In re Goff*, 250 F.3d 273, 276 (5th Cir.2001). However, it was clearly ineffective assistance of counsel to *not* object. The Texas Court of Criminal Appeals said as much in its opinion. Yet, that issue was *not* raised on state habeas.

> The Court of Criminal Appeals held:

> In points of error nine and ten, appellant complains that the trial court commented on the weight of the evidence and demonstrated a bias in favor of the State during the prosecutor's questioning of LaKeyda Patterson at the punishment phase of the trial. Defense counsel asked LaKeyda on cross-examination if she had seen Shemika holding a gun during an argument with appellant. The prosecutor then asked LaKeyda about the incident:

42

[PROSECUTOR]: Were they having a good conversation? What was going on?

[LAKEYDA]: I'm not sure what kind of conversation.

[DEFENSE COUNSEL]: Then it would be speculation, Your Honor.

[PROSECUTOR]: I'll reword, Judge.

[PROSECUTOR]: Based on the body language that you saw out there, were they doing okay together or were they not?

[DEFENSE COUNSEL]: Again, speculation, Your Honor.

THE COURT: Why don't you ask her about her observations?

[PROSECUTOR]: Based on your observations of [appellant] and Shemika when you looked out the window, were you able to determine what was going on?

[LAKEYDA]: It looked like a slight argument and then make up.

[PROSECUTOR]: All right. So, there's an argument and at some point you see [appellant] with his gun; is that correct?

[LAKEYDA]: Yes.

[PROSECUTOR]: And then Shemika takes it away from

him?

[LAKEYDA]: Yes.

     Appellant argues that the trial court "injected its own solution to the problem the State was having in forming the correct question to ask the witness," and thus, "gave the appearance to the jury that the trial court was coaching the State in the prosecution of its case." Appellant asserts that "the trial court appeared to the jury to be commenting on the importance of the testimony to be elicited by the prosecutor by suggesting a way that the prosecutor could, within the rules of evidence, bring that testimony before the jury." Appellant complains that this denied him due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, denied him an impartial jury and due course of law under Article I, §§ 10 and 19 of the Texas Constitution, and violated Article 38.05.

     Appellant acknowledges that he failed to object to the trial court's question, but argues that no objection was required because the question constituted fundamental error. Appellant cites *Blue v. State*. In *Blue*, the trial court stated at the beginning of jury selection that the defendant had seriously considered entering into a plea bargain and that the trial court would have preferred that the defendant plead guilty. A plurality of this Court concluded that the comments of the trial court, which tainted the defendant's presumption of innocence in front of the venire, were fundamental error of constitutional dimension and required no objection. In the present case, unlike Blue, the trial court asked the question at the punishment phase of the trial, after the jury had already found appellant guilty of

capital murder. The trial court's question (assuming it was improper at all) did not rise to such a level as to bear on the presumption of innocence or vitiate the impartiality of the jury. **Because appellant failed to object to the trial court's question, he forfeited his right to complain on appeal**. Points of error nine and ten are overruled. (Emphasis added).(Footnotes omitted).

*Francois v. State,* 2006 WL 2615306, 6 -7.

The victim impact evidence was so over-the-top in this case and yet it was not raised as an issue on appeal in a constitutional claim - merely a violation of Rule 701.There was a clear confrontation issue as well as a violation of Due Process in denying Mr. Francois a fair trial worthy of confidence.   The Court of Criminal Appeals rejected this issue:

In point of error eight, appellant argues that the trial court erroneously permitted Michelle Antoinette Brothers Frank to give speculative testimony at punishment about Shemika's nightmares after the triple murder.

The prosecutor, outside the presence of the jury, stated that she intended to present in rebuttal the victim impact testimony of Ms. Frank, the woman with whom Shemika had been living since the shootings. The prosecutor stated that she expected Ms. Frank to testify that Shemika suffered from nightmares after her sisters' deaths. Defense counsel argued that Ms. Frank's testimony "calls for a conclusion on the part of this witness that she's not qualified to make." Ms. Frank testified on voir dire examination by defense counsel about her observations of Shemika's nightmares. The trial court ruled the testimony admissible, over defense counsel's objection that it was "speculative," that there was "no way to know" what

45

Shemika was dreaming about, and that Ms. Frank had "no training ... to make that interpretation." that Ms. Frank's testimony was inadmissible because her opinion failed to meet the requirements of *Tex.R. Evid. 701.*

Ms. Frank testified in the presence of the jury that Shemika came to live with her and her family after the shootings. She further testified as follows:

[PROSECUTOR]: And I want to talk with you very briefly about the changes that you've seen in Shemika since she got out of the hospital since this offense occurred.

[Frank]: Okay.

[PROSECUTOR]: Can you tell the jury, please, during the nighttime is there anything that happens?

[Frank]: She has nightmares. She screams. She cries. She-once before she screamed out, "Make him stop. Please make him stop." She screamed out, "Nana, move. Nana, move."

[PROSECUTOR]: Who's Nana?

[Frank]: Nana is a short name for Naikeshia.

[PROSECUTOR]: So, "Nana, move"?

[Frank]: "Nana, move. Nana, move."

* * *

[PROSECUTOR]: Tell the jury how you would find her.

46

[Frank]: She would be-she slept in the bottom of a twin bed. The twin bed was-is a full-sized bed. She would be balled up, pulling the cover tightly, I guess, so no one could pull it off her. But I would pull and Dante would pull and finally we would get her to release it and she would be in tears.

And we would have to kind of, like, I shake her to wake her up. And once she wake up, I would let her know that, "I'm here for you. It's going to be all right. Just hold on, baby."

[PROSECUTOR]: Tell the jury once you wake her up how did she react? You said she was tearful. Once she is awake, what happens?

[Frank]: She tends to, like-one time before she would kind of, like-the bed is against the wall. One time before she would, like, go in the corner of the bed where she [was] at and I would have to climb up on there and I would talk to her. And we can, you know, talk to her, me and Dante. And one time before, Dante and me-and I would try to talk her from coming out of that corner of the bed.

Rule 701 of the Texas Rules of Evidence, entitled "Opinion Testimony By Lay Witnesses," provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

"Perceptions refer to the witness's interpretation of information acquired through his or her own senses or experiences at the time of the event (i.e., things the witness saw, heard, smelled, touched, felt, or tasted)." The witness

must personally observe or experience the events about which he or she is testifying.

Ms. Frank testified that she personally saw Shemika screaming and crying in her sleep and cowering under the covers at the corner of her bed. She personally heard her scream, "Make him stop," and "Nana, move." Ms. Frank's testimony was factual, not speculative. Her testimony that Shemika was having nightmares was rationally based on her observations. Ms. Frank's testimony was also helpful to the determination of the mitigation issue. Victim impact evidence is admissible, "in the context of the mitigation special issue, to show the uniqueness of the victim, the harm caused by the defendant, and as rebuttal to the defendant's mitigating evidence. Here, of course, Shemika was not only the sister of the three dead girls, she was also a direct victim of appellant's conduct: he shot her in the side before he killed her sisters, and then he shot her in the face after he killed her sisters, telling her that if he couldn't have her, then nobody was going to have her. Ms. Frank's testimony was relevant under Rules 401-403 and admissible under Rule 701. Point of error eight is overruled. (Footnotes omitted).

*Francois v. State,* 2006 WL 2615306, 3 -4  (Tex.Crim.App.2006).

Mr. Francois would ask this case be remanded to the state district court for a complete investigation and writ of habeas corpus to be completed and for the state courts to have an opportunity to address the multiple errors not raised or properly preserved for Mr. Francois.

## **PRAYER**

WHEREFORE,  PREMISES CONSIDERED, it is respectfully requested that this Honorable Court

     1.  Vacate the petitioner's conviction.

     2.  Vacate the petitioner's sentence.

     3.  Issue a writ of habeas corpus so that the petitioner may be relieved of his illegal restraint of liberty, such restraint being founded upon an unlawful and unconstitutional conviction and sentence based upon ineffective assistance of counsel.

     4.  Permit discovery, pursuant to Rule 6, Rules - Section 2254 cases.

     5.  Allow the petitioner a period of time within which to file such amendments to this application as might be necessary to bring all proper matters before this Court.

     6.  Permit the filing of a traverse or reply to the state's answer.

     7.  Finally, to grant such other and further relief as this court may deem appropriate.

Respectfully Submitted,


*/s/ Jani Maselli*

_____

JANI J. MASELLI
State Bar of Texas Number 00791195
808 Travis Street, 24th Floor
Houston, Texas 77002
(713) 757-0684

Attorney for Petitioner,
Anthony Francois

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of June 2010, a true and correct copy

of the foregoing pleading was served upon opposing counsel by ECF, addressed to:


Assistant Attorney General
Jeremy Greenwell
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548


*/s/ Jani Maselli*

_____

JANI MASELLI