IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANTHONY FRANCOIS, | § | |
| Petitioner, | § | |
| | § | Civil Action No. 4:10-cv-837 |
| v. | § | (District Judge Lynn N. Hughes) |
| | § | |
| RICK THALER, | § | * DEATH PENALTY CASE * |
| Director, Texas Department | § | |
| of Criminal Justice, | § | ECF |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

RESPONDENT THALER'S ANSWER WITH BRIEF IN SUPPORT

In July 2004, Petitioner Anthony Francois was found guilty of capital murder and sentenced to death for the senseless murders of nine-year-old Britanny Patterson and ten-year-old Ashley Patterson. He now alleges that numerous constitutional violations occurred during his trial and seeks federal habeas corpus relief in this Court pursuant to 28 U.S.C. §§ 2241 & 2254. As demonstrated below, however, Francois's federal habeas corpus petition must be denied because it is wholly without merit.

FRANCOIS'S ALLEGATIONS

The Director understands Francois to raise the following ten grounds for habeas corpus relief:

1.  He was denied his right to effective assistance of counsel at the punishment phase of trial by counsel's decision to call Jadon West to testify as a witness [Amended Pet., at 9-14];

2.  He was denied the effective assistance of counsel at punishment by counsel's failure to object to (a) judicial bias displayed when the judge assisted the prosecutor in questioning a key witness, and (b)

victim impact evidence admitted through a non-victim that violated the Confrontation Clause [Amended Pet., at 17-21];

3.   The Texas death penalty scheme is unconstitutional because it fails to require the State to prove the lack of sufficient mitigating circumstances before the second special issue may be answered in the negative [Amended Pet., at 22-24];

4.   The Texas death penalty scheme violates the Eighth Amendment because it fails to require the State to prove, beyond a reasonable doubt, that there is an absence of a circumstance that would justify a life sentence [Amended Pet., at 25-27];

5.   The Texas death penalty scheme is unconstitutional because it fails to provide a method by which the State determines the death-worthiness of the defendant and because the decision as to which defendant is to be subjected to the death penalty varies from county to county [Amended Pet., at 25-27];

6.   The Texas death penalty scheme is unconstitutional due to the jury's inability to predict future dangerousness [Amended Pet., at 28];

7.   The trial court violated his constitutional rights by denying his "Motion to Declare the Texas Capital Sentencing Scheme Unconstitutional and Motion to Preclude Imposition of the Death Penalty," which argued that the Texas death penalty scheme was unconstitutional for the following reasons [Amended Pet., at 29-30]:

   (a)   the mitigation special issue fails to place the burden of proof on the State regarding aggravating evidence;

   (b)   the mitigation special issue permits the very type of open-ended discretion condemned in Furman v. Georgia;

   (c)   Article 37.071 does not permit meaningful appellate review;

   (d)   the definition of "mitigating evidence" limits the concept of mitigation to factors that render a capital defendant less morally blameworthy;

2

      (e)      capital punishment, as administered, amounts to cruel and unusual punishment according to Blackmun's dissent in Callins v. Collins;

      (f)      the "10-12 provision" in Article 37.071 violates constitutional principles discussed in Mills v. Maryland and McCoy v. North Carolina;

      (g)      Article 37.071 fails to inform the jury that a single holdout juror on any special issue results in a life sentence.

8.      In light of the many different capital sentencing schemes that have been in operation in the post-Furman era, the trial court erred in overruling the above-motions because the death penalty in Texas is arbitrarily imposed [Amended Pet., at 31-36];

9.      The trial court commented on the weight of the evidence and demonstrated a bias in favor of the State during the prosecutor's questioning of LaKeyda Patterson at the punishment phase which violated his constitutional rights [Amended Pet., at 37-41]; and

10.      He received ineffective assistance during state habeas due to counsel's failure to raise certain claims in his state habeas petition [Petition at 42-48].

None of the above claims raised by Francois provide an adequate basis for federal habeas relief. Initially, the Director asserts that Francois's second and tenth claims have not been presented to the Texas Court of Criminal Appeals for review and are, therefore, unexhausted and procedurally defaulted. Further, although each of the remaining claims was previously presented to the state court and are thus considered exhausted, Francois has completely failed to demonstrate that the state court's adjudication of these claims was either contrary to, or involved unreasonable applications of, clearly established federal law. As such, federal habeas relief should be denied.

## STATEMENT OF THE CASE

Francois was indicted, convicted, and sentenced to death in Harris County, Texas, for the September 11, 2003, murders of Britanny and Ashley Patterson. I CR 2 (Indictment); IV CR 849-50 (Judgment).[1]  His conviction and sentence were affirmed by the Court of Criminal Appeals on direct appeal in an unpublished opinion delivered September 13, 2006.  Francois v. State, No. 74,984 (Tex. Crim. App.).  Francois did not seek a writ of certiorari with the United States Supreme Court off of his direct appeal.

While his direct appeal was still pending, Francois also filed a state application for writ of habeas corpus in the trial court raising two claims for relief.  Ex parte Francois, No. 71,345-01; SHCR at 2-26.[2]  After considering Francois's application, the State's answer, trial counsel's affidavit, and the record of the trial, the trial court ultimately entered findings of fact and conclusions of law recommending that relief be denied.  SHCR at 83-94.  Based upon these findings and conclusions as well as its own review of the record, the Court of Criminal Appeals then denied relief.  SHCR at cover; Per Curiam Order dated March 11, 2009.  Francois subsequently filed a federal petition for habeas corpus relief in this Court a year later, with a nearly identical amended petition filed thereafter on June 6, 2010.  Docket Entry (DE) 1, 3.

---

[1]     The Director previously forwarded a copy of the state court records to the Court, which were filed on February 25, 2010.  "CR" refers to the Clerk's Record, and is preceded by volume number and followed by the relevant page number.

[2]     "SHCR" refers to the state habeas Clerk's Record—the transcript of pleadings and documents filed with the court during Francois's state habeas proceeding—and is also followed by the relevant page numbers.

STATEMENT OF FACTS

I.     Facts of the Crime

Shemika Patterson first began seeing Francois in 2001 when she was just fourteen years old.  17 RR 52-53.[3]  Although Francois told her that he was nineteen years old at the time, she later found out that he was thirty-five when she saw his driver's license.  17 RR 152-53, 168.  Nevertheless, Shemika continued the relationship with Francois until May 2002, at which time she began dating another man, Dante Jones.  17 RR 154, 158-59, 205-206.  Shemika did not see Francois until the following year, when she engaged in a brief sexual relationship with him that summer despite still dating Jones.  17 RR 159-64, 206.

Francois told a friend that he was unhappy with the way Shemika was treating him, and stated that if he could not have her, nobody could.  18 RR 157-63.  Francois spoke of killing Shemika on a couple of occasions, and about a week before the instant offense he stated that was going to kill Shemika's younger sisters, Naikeshia (15), Ashley (10), and Britanny (9), while Shemika watched.  18 RR 164-66, 183, 186.  The day before the murders Francois spoke with Shemika about their relationship and asked if she was going to leave Jones.  17 RR 174.  Apparently unsatisfied with her response, Francois told Shemika he was going to find Jones and kill him, and then left angrily.  17 RR 169-75, 178.

_____

[3]      "RR" refers to the Reporter's Record of transcribed trial proceedings, and is preceded by volume number and followed by page numbers.  "SX" refers to the State's exhibits followed by exhibit number and page numbers where applicable.  "DX" refers to the defense's exhibits, and again is followed by exhibit number and page numbers where applicable.

In the early morning hours of September 11, 2003, Francois entered the home of Sheila Patterson, Shemika's mother, while her four children were asleep.  17 RR 148-49, 181-82.  Sheila was in bed listening to the radio when Francois walked into her bedroom.  17 RR 235-36.  Startled, she asked Francois what he was doing there, but he did not respond.  17 RR 236.  Instead, he asked Patterson was time it was, left, then returned a few minutes later with a handgun and pointed it at Sheila's chest.  17 RR 237-38.  Sheila eased up, then ran past Francois screaming and hollering to the children's bedroom.  17 RR 238-39.  He followed Sheila into the bedroom and shot her, striking her left arm and chest.  17 RR 239.

Sheila's screams awakened Shemika, whom Francois shot in the side as she tried to leave the room.  17 RR 185-90.  Laying on the floor, she heard her sister Naikeshia saying, "Anthony, it's Anthony."  17 RR 197.  Holding her mother, Naikeshia then told Francois that "I'm not going to let you kill my mama and you're going to have to kill me first."  17 RR 198.  Shemika watched as Francois shot and killed Naikeshia.  17 RR 198.  He then turned back towards Shemika, told her that no one could have her if he could not, and shot her in the face.  17 RR 199.

Shemika eventually regained consciousness and noticed blood dripping from the top bunk where ten-year-old Ashley and nine-year-old Britanny had been sleeping.  17 RR 200.  She crawled into the living room and called 911, and even managed to tell the arriving police officer that "my boyfriend shot me and my family" and that "my boyfriend's name is Anthony Francois."  17 RR 47, 202.  Ashley and Britanny were found on the top bunk, having both been shot in the

6

head.  17 RR 56-57.  They were pronounced dead at the hospital, and Naikeshia was pronounced dead at the scene.  18 RR 113, 120-25, 134; SX 78, 81, 85.  Their mother, Sheila, was found on the ground in an alleyway near the house and told police that Francois had shot her and her family.  17 RR 58-62.  Both Sheila and Shemika survived and testified at trial.

Following his arrest, Francois gave a videotaped statement confessing that he committed the murders because he "lost control."  19 RR 73; SX 1.  According to Francois, he was upset with Shemika for deciding that she did not want to be with him anymore, and he wanted to retaliate against her whole family.  He could not accept the fact that Shemika told him not to call or come by anymore, and felt that if he could not have her then nobody could.  Id.

II.    Evidence Relating to Punishment

In addition to the evidence presented at the guilt/innocence phase of trial concerning the horrific nature of the instant offense, the jury also heard an abundance of evidence at the punishment phase concerning Francois's past criminal behavior and proclivity for violence.  In December 1984, Francois was with his friends when he pulled a gun on a man named Simon who had accused Francois and his friend of breaking into his house.  20 RR 32-44.  Although Francois had passed the gun to his friend who then shot and killed Simon, Francois admitted to his involvement in the murder and that he had obtained the gun from another burglary he had committed.  20 RR 68-69.  For his part in the murder, Francois was sentenced as a juvenile to the Texas Youth Commission.

A few years later in April 1987, Francois and a girlfriend went to the

7

apartment of Cedric Mims after Mims' sister, Melanie, had ended her relationship with Francois. 20 RR 81-84. The girl with Francois immediately began fighting Melanie when they arrived, and Francois pulled a gun on Cedric to prevent him from stopping the fight. 20 RR 82-85. Around a month later, Francois's car was seen backed up to the apartment of Cedric Mims's stepmother, Sandra Mims, who testified that her home had been burglarized. 20 RR 92-4; 21 RR 6-10. Francois was subsequently convicted of felony burglary of a habitation and was sentenced to seven years confinement in prison. 21 RR 124.

In January 1988, Francois was dating sixteen-year-old Trina Guillory when they began to argue in her front yard. 21 RR 52-54. Francois drew his gun, fired four shots into the air, and later attempted to evade police when they arrived. 21 RR 55-65. Francois was eventually caught as he ran inside Guillory's mother's home, and the firearm was recovered from Francois's car. 21 RR 58, 65-66. He was convicted of the misdemeanor offenses of carrying a weapon and evading arrest, and was sentenced to sixty days in jail. 21 RR 124. Later that year, Francois was convicted of possession of a controlled substance and sentenced to seven years confinement in prison. 21 RR 124-25. Francois would be convicted for the same offense two years later and received an additional ten-year sentence. 21 RR 125.

Yvette Zachary testified that in April 1991 she opened the door of her apartment to allow an acquaintance, Jadon West, to use her restroom. 21 RR 15-18. As West was leaving, Zachary opened the door to let him out but Francois and an unidentified man entered with guns drawn, took her necklace and some

8

money, and then left.  21 RR 18-21.  Five or six days later, Zachary saw Francois and West drive by as she was leaving her grandmother's house.  21 RR 22. Francois fired at her with a shotgun, but missed and hit her car instead.  21 RR 23-24.  Francois was eventually convicted of felony robbery and sentenced to ten years in prison.  21 RR 25.

James Ivory, who conducted vehicle inspections of new cars at a local Ford dealership, testified that his trailer had been robbed in January 2001 and that the keys to one of the new vehicles, along with the vehicle itself, had been taken. 21 RR 35-40.  Over a year later, Houston police stopped Francois in the stolen vehicle, who claimed that although the vehicle was priced at $30,000, he had purchased the car from an associate for only $500.  21 RR 42-48.  Francois was subsequently convicted in May 2002 of unauthorized use of a motor vehicle and sentenced to one year of jail time.  21 RR 125.

A few months prior to the above conviction, Francois called Deanna Ellis to see if she would go out with him, but she said no.  21 RR 71-72.  Francois called back later and said that he was going to bring over Shemika Patterson to fight her because she was jealous over something.  21 RR 72-73.  Francois then arrived with Shemika who immediately began fighting Ellis.  21 RR 75.  When some family members tried to intervene, Francois pulled a pistol and threatened to kill them if they got in the way.  21 RR 75-77.

In April 2002, Francois spent the night at Shemika Patterson's house, who had her seventeen-year-old cousin, LaKeyda Patterson, over for a sleep-over.  21 RR 83-85.  Although Francois fell asleep on a different couch than LaKeyda and Shemika, LaKeyda woke in the middle of the night to find Francois rubbing her

legs while her cousin was still asleep.  21 RR 87-88.  LaKeyda testified that Francois moved her nightgown up, pulled her panties down and penetrated her vagina with his penis, but stopped after she twice told him to stop.  21 RR 88-94. Despite her parents finding out after seeing red marks on her neck, no charges where ever filed against Francois.  21 RR 96-97, 100.

In response to the State's evidence, the defense presented several witnesses in an attempt to impeach the credibility of the State's witnesses and provide mitigating circumstances for the jury's consideration.  First, the defense presented the testimony of Erica Walker, Deanna Ellis's cousin, who was present the day Francois brought Shemika over to fight Deanna.  21 RR 141-45.  Walker testified that Francois never displayed a weapon to anyone during the fight nor threatened her family in any way.  Id.  The defense then called Jadon West to contradict Yvette Zachary's testimony that she had never seen Francois before the April 1991 robbery.  22 RR 50-56.  West stated that Zachary had hired himself and Francois to transport drugs from Houston to Port Arthur, but then refused to pay them the $3,000 they had agreed on for the work.  22 RR 52. Consequently, they decided to rob her.  22 RR 52.  West also contradicted Zachary's statement that Francois had a gun, or that she was present when they shot up her rental car.  22 RR 54-55.

As mitigating evidence, the defense presented Larry Fitzgerald, a former public information officer with the Texas Department of Criminal Justice, who testified that a defendant receiving a life sentence in a capital murder case must serve a minimum of forty years before becoming eligible for parole.  22 RR 5-8. Fitzgerald described the prison process to determine whether an inmate is

10

placed in administrative segregation , and stated that Francois's disciplinary records from prior prison sentences were for minor violations such as possessing food, masturbating, and grooming violations.  22 RR 5-15.  The defense then presented Francois's two sisters, Lisa Maxwell and Tracy Singleton, as well as his mother, Linda Francois Duncan, to testify that Francois was abused by his stepfather as a child.  22 RR 62-63, 72, 79.  His mother also described Francois as being in shock when she told him that he was a product of rape when she was only fourteen.  22 RR 75, 87.  Francois's grandmother, Fern Hailey, then testified that Francois was depressed when his leg was amputated at the age of seven.  22 RR 99, 105.

In rebuttal, the State presented Michelle Frank to testify about the changes she has seen in Shemika Patterson since she came home from the hospital to live with her and her son, Dante.  22 RR 130-34.  According to Frank, Shemika screams and cries during the night, and has nightmares where she yells out things like, "Please make him stop" and "Move, Nana, move."  22 RR 133.  Lastly, Sheila Patterson's sister, Gwendolyn Turner, testified about the chaos her family was in when she arrived at the hospital following the murders, and described the effect the murder of Sheila's young children had on her and Sheila.  22 RR 135-42.

## STANDARD OF REVIEW

Francois's petition is governed by the heightened standard of review provided by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  28 U.S.C.A. § 2254 (West 2010).  Under § 2254(d), Francois may not obtain federal habeas corpus relief

with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Supreme Court has recently explained this intentionally difficult standard stops just short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. Harrington v. Richter, 562 U.S. ___, 131 S.Ct. 770, 786 (2011)(citing Felker v. Turpin, 518 U.S. 651, 664 (1996)). In order to obtain federal habeas relief on a claim previously adjudicated on the merits in state court, a petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id.

When reviewing claims previously rejected by a state court, the pivotal question for a federal court is whether the state court's determination was factually or legally unreasonable. Id.; Montoya v. Johnson, 226 F.3d 399, 404 (5th Cir. 2000). It is well established that a federal court may grant habeas relief only if a state court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." (Terry) Williams v. Taylor, 529 U.S. 362, 413 (2000). But under §2254(d), "a

12

federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.   Rather, that application must also be unreasonable."   Id. at 411.   An "unreasonable application" occurs then "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."   Id. at 413. Thus, even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. Harrington, 131 S.Ct. at 786 (citing Lockyer v. Andrade, 538 U.S. 63, 71 (2003)).

A federal habeas court's inquiry into unreasonableness should always be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. (Terry) Williams, 529 U.S. at 409-11; Tucker v. Johnson, 242 F.3d 617, 620-21 (5th Cir. 2001).  Instead, federal habeas relief is only merited where the state court decision is both incorrect and objectively unreasonable. (Terry) Williams, 529 U.S. at 411; Martin v. Cain, 246 F.3d 471, 476 (5th Cir. 2001).  In other words, a state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision.  Harrington, 131 S.Ct. at 786 (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Further, the Fifth Circuit has held that it is the state court's "ultimate decision" that is to be tested for unreasonableness, "not every jot of its reasoning."  Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001); see Neal v.

13

Puckett, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under [§] 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence"); Catalan v. Cockrell, 315 F.3d 491, 493 (5th Cir. 2002) (applying AEDPA deferential standard of review where state habeas writ was denied without explanation). Indeed, state courts are presumed to know and follow the law.  Woodford v. Visciotti, 537 U.S. 19, 24 (2002).  And even where the state court fails to cite to applicable Supreme Court precedent or is unaware of such precedent, the AEDPA deferential standard of review nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]. "  Early v. Packer, 537 U.S. 3,  8 (2002).

In review of a state prisoner's federal habeas petition, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Jackson v. Johnson, 150 F.3d 520, 524 (5th Cir. 1998).  Moreover, where the petitioner

has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that

(A) the claim relies on

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2); Murphy v. Johnson, 205 F.3d 809, 815 (5th Cir. 2000).

Thus, in state court, a petitioner "must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met." (Michael) Williams v. Taylor, 529 U.S. 420, 437 (2000).

## ARGUMENT

I.  Two of Francois's Claims are Unexhausted and Procedurally Barred from Federal Habeas Corpus Relief.

Francois raises a total of ten allegations (excluding sub-parts) in his amended petition requesting habeas relief from this Court. As discussed below, however, two of Francois's claims do not entitle him to federal habeas relief because they are unexhausted and procedurally defaulted. Francois admittedly failed to exhaust state court remedies with regard to claims 2 and 10 by failing to present them to the Court of Criminal Appeals for review either on direct appeal or in a state writ application. It is equally clear, however, that should Francois now attempt to return to state court, he would be barred from raising these claims in a successive state habeas application under Article 11.071

Section 5(a) of the Texas Code of Criminal Procedure.[4]   Because such unexhausted claims are considered to be procedurally defaulted from federal habeas review, Francois is not entitled to relief on either of them.

Pursuant to §2254(b)(1)(A), habeas corpus relief may not be granted "unless it appears that the applicant has exhausted the remedies available in the courts of the State."   However, "[b]ecause [the exhaustion] requirement refers only to remedies still available at the time of the federal petition, it is satisfied if it is clear that the habeas petitioner's claims are now procedurally barred under state law."   Gray v. Netherland, 518 U.S. 152, 161 (1996) (internal citations omitted); see also Castille v. Peoples, 489 U.S. 346, 351 (1989); Engle v. Isaac, 456 U.S. 107, 125 n.28 (1982); Graham v. Johnson, 94 F.3d 958, 969 (5th Cir. 1996) ("exhaustion is not required if it would plainly be futile"). Nonetheless, such an unexhausted claim is subject to denial in federal court as procedurally defaulted.   Although under Harris v. Reed, 489 U.S. 255, 265 (1989), federal review of a habeas claim is procedurally barred only if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default,

> [t]his rule does not apply if the petitioner failed to exhaust state
> remedies and the court to which petitioner would be required to
> present his claims in order to meet the exhaustion requirement
> would now find the claims procedurally barred.  In such a case there
> is a procedural default for purposes of federal habeas regardless of

---

[4]      Article 11.071 Section 5(a) provides that a state court may not consider the merits of or grant relief on claims presented in a successive state habeas application absent facts giving rise to a statutory exception.  Francois has made no showing that one of the Article 11.071 exceptions would apply to allow review of this claim in state court.

16

the decision of the last state court to which the petitioner actually
presented his claims.

Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991).  In the instant case, just as
in Gray, "the procedural bar which gives rise to exhaustion provides an
independent and adequate state-law ground for the conviction and sentence, and
thus prevents federal habeas corpus review of the defaulted claim, unless the
petitioner can demonstrate cause and prejudice for the default." 518 U.S. at 162
(barring claim on basis that claim would be barred in state court if it were
presented there); Nichols v. Scott, 69 F.3d 1255, 1280 (5th Cir. 1995)(same).

The Fifth Circuit has consistently held that where a petitioner raises
claims in federal court that have not previously been presented to the state
courts, and Article 11.071, Section 5(a) would apply to foreclose review of the
claims if presented in a successive state habeas application, such is an adequate
state procedural bar foreclosing federal habeas review of the claims.  Williams
v. Thaler, 602 F.3d 291, 305-06 (5th Cir. 2010)(holding that a petitioner's
ineffective-assistance-of-counsel claim was procedurally defaulted because if the
petitioner returned to state court, the court would not consider the merits under
Article 11.071, Section 5(a)) Beazley v. Johnson, 242 F.3d 248, 264 (5th Cir.
2001); Muniz v. Johnson, 132 F.3d 214, 221 (5th Cir. 1998); Nobles v. Johnson,
127 F.3d 409, 422 (5th Cir. 1997).  Accordingly, a procedural default such as this
will bar federal habeas review unless the petitioner can show cause for the
default and resulting prejudice, or demonstrate that the court's failure to
consider the federal claim will result in a "fundamental miscarriage of justice."
Harris, 489 U.S. at 262; Barrientes v. Johnson, 221 F.3d 741, 758 (5th Cir. 2000).

In this case, Francois neither distinguishes his case from Beazley, Nobles and Muniz, nor demonstrates cause and prejudice for his failure to raise his claims in state court. Similarly, he fails to demonstrate that the Court's dismissal of these claims will result in a "fundamental miscarriage of justice." Instead, he makes the following conclusory argument: that while "he cannot establish an outside influence, other than the poor performance by his state habeas attorney to raise the issues, clearly there is a miscarriage of justice for this court not to consider these claims" due to alleged evidence that he "suffered in his life." Amended Pet., at 18.

Yet, it has been well established that any such error by counsel committed in a post-conviction proceeding, where there is no constitutional right to counsel, cannot constitute cause. Coleman, 501 U.S. at 755; Elizalde v. Dretke, 362 F.3d 323, 330 (5th Cir. 2004); Beazley, 242 F.3d at 270-72; Martinez v. Johnson, 255 F.3d 229, 239-41 (5th Cir. 2001). As such, Francois fails to meet the "cause" standard for default set forth in Murray v. Carrier, 477 U.S. 478, 485 (1986). Since Francois lacks "cause" for failing to raise the instant claims in a procedurally allowed habeas application, this Court need not consider whether he was prejudiced by his inability to raise the alleged claims at this late date. McCleskey v. Zant, 499 U.S. 467, 501 (1991) (citing Murray, 477 U.S. at 494) (rejecting proposition that showing of prejudice permits relief in the absence of cause). Furthermore, since Francois has provided nothing more than a bare assertion that he "suffered in his life," he completely fails to establish that a miscarriage of justice exception should apply. Thus, Francois's claims 2 and 10 are procedurally barred from federal habeas review and should be denied.

18

II.   Francois Was Not Denied the Effective Assistance of Counsel at the Punishment Phase of Trial (Claims 1, 2).

In his first and second grounds for relief, Francois asserts that he was deprived of his right to effective assistance of counsel at the punishment phase of his trial. Amended Pet., at 9-21, 42-48. Specifically, Francois contends that counsel was ineffective for (1) calling Jadon West to testify as a witness on his behalf; (2) failing to object to the judicial bias displayed by the trial court in favor of the State during the questioning of LaKeyda Patterson; and (3) failing to properly object under the Confrontation Clause to the admission of the victim impact evidence presented through the testimony of Michelle Frank. Id. As discussed below, none of these allegations entitle Francois to habeas relief.

To start, the Court of Criminal Appeals rejected Francois's first assertion when he raised it during his state habeas proceedings, adopting the trial court's conclusion that Francois "fails to demonstrate deficient performance, much less harm, based on [his] ineffective assistance of counsel habeas claim regarding trial counsel calling Jadon West as a punishment witness."  SHCR at 90. Because Francois completely fails to demonstrate how the Texas courts' rejection of this claim was either contrary to or an unreasonable application of the Strickland v. Washington[5] standard, he is not now entitled to federal habeas relief.

With regard to Francois's second and third allegations, as discussed in the previous section, Francois failed to raise these claims before the Court of Criminal Appeals in either his direct appeal or state habeas corpus proceedings.

---

[5]   466 U.S. 668 (1984).

19

See Section I above.  Consequently, both of these allegations are unexhausted and procedurally barred in this Court.  Regardless of the procedural bar, however, Francois fails to demonstrate that trial counsel performed deficiently or that the alleged deficiency had any prejudicial effect on the outcome of the punishment phase.  Habeas relief should therefore be denied on those claims as well.

  A.  The Strickland standard.

  Under Strickland, a petitioner cannot establish a violation of his Sixth Amendment right to counsel unless he demonstrates that (1) counsel's performance was deficient and (2) this deficiency prejudiced his defense.  466 U.S. at 687-88, 690.  In determining the merits of an alleged Sixth Amendment violation, courts "must be highly deferential" to counsel's conduct, and a petitioner must show that counsel's performance fell beyond the bounds of prevailing objective professional standards.  Id. at 687-89.  A reviewing court "must strongly presume that trial counsel rendered adequate assistance and that the challenged conduct was the product of a reasoned trial strategy."  Wilkerson v. Collins, 950 F.2d 1054, 1065 (5th Cir. 1992).  Every effort must be made to eliminate the "distorting effects of hindsight."  Strickland, 466 U.S. at 689.  Accordingly, there is a strong presumption that an alleged deficiency "falls within the wide range of reasonable professional assistance."  Id.

  Further, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution."  Id. at 692.  In order to establish that he has sustained prejudice, Francois "must show that there is a reasonable probability that, but for counsel's unprofessional

20

errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine the confidence in the outcome."  Id. at 694; Loyd v. Whitley, 977 F.2d 149, 159 (5th Cir. 1992). Because this showing of prejudice must be "rather appreciable," a mere allegation of prejudice or the possibility of a different outcome is not sufficient to satisfy the prejudice prong of Strickland.  Crane v. Johnson, 178 F.3d 309, 312 (5th Cir. 1999); Armstead v. Scott, 37 F.3d 202, 206 (5th Cir. 1994).  As the Supreme Court recently explained: "[T]he question in conducting Strickland's prejudice analysis is not whether a court can be certain [that] counsel's performance had no effect on the outcome or whether it is possible [that] a reasonable doubt might have been established if counsel [had] acted differently." Richter, 131 S. Ct. at 791 (emphasis added). Rather, the "likelihood of a different result must be substantial, not just conceivable."Id. at 792.

Because Francois must satisfy both prongs of the Strickland test, a failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong.  Strickland, 466 U.S. at 697; Ramirez v. Dretke, 398 F.3d 691, 697 (5th Cir. 2005).

> B.    Counsel's decision to present the testimony of Jadon West was a reasonable strategic decision.

At the punishment phase of Francois's trial, the State presented testimony from Yvette Zachary concerning her being robbed at gunpoint one night in her home by Francois, Jadon West, and an unidentified man. 21 RR 15-25.  Zachary testified that she knew West as an associate of her uncle, but did not know Francois or the other man.  Id. at 17, 19.  According to Zachary, Francois and the

third man pointed guns at her, took the necklace off of her neck, and stole about a thousand dollars from her purse. Id. at 20-21. Several days later while at her grandmother's house, Zachary saw Francois and West drive by and shoot at her and her car with a shotgun. Id. at 22-24. Houston police later arrested Francois for the robbery and recovered a shotgun underneath the sofa where Francois was sitting. Id. at 30-32.

On cross examination, Zachary again stated that she had not seen Francois before the robbery. Id. at 25-26. Trial counsel then attempted to attack Zachary's credibility with the following questions:

> Q:   Okay. Did you have some type of business relationship with Mr. West?
>
> A:   No.
>
> Q:   Isn't it a fact that Mr. West and Anthony Francois were mad at you because they had transported some drugs for you and you were supposed to pay them some money and that you did not pay them?
>
> A:   That's not true.

Id. at 26. Trial counsel then elicited testimony that the father of Zachary's son, Eric Russell, was in federal prison for dealing drugs. Id. at 26-27.

Once the State rested its case, the defense called West as one of its witnesses in a further attempt to undermine Zachary's credibility. 22 RR 50-55. West testified that it was Francois who introduced him to Zachary, and that the two of them had transported drugs for her in the past. Id. at 51-52. West also contradicted Zachary's version of the events by testifying that Francois did not have a gun during the robbery, and that they had tried peacefully to get Zachary

to pay them the money she owed them before they decided to rob her.  Id. at 53-
54.  In addition, West challenged Zachary's testimony concerning her being shot
at a week later, stating that Zachary "was nowhere around" when he had a
shootout with two of Zachary's workers in one of her rental cars.  Id. at 54-55.

Francois now asserts that trial counsel's decision to call West as a witness
constituted ineffective assistance since it implicated Francois in a significant
drug transaction.  Amended Pet., at 9-16.  He argues that no witness whose
testimony could potentially damage the jury's image of a defendant should ever
be called to testify for the defense.  Id. at 15.  Citing cases wherein counsel's
decision not to present "double-edged" testimony was found reasonable, Francois
makes the bold proclamation that "if refusing to proffer damaging evidence is not
ineffective assistance of counsel, then choosing to proffer damaging evidence is
ineffective assistance of counsel."  Id. at 16.  Notwithstanding the fact that this
assertion has no basis in law, however, the record in this case clearly indicates
that counsel's decision to call West was a reasonable strategic decision.

To start, prior to the presentation of West's testimony by the defense, the
State had already presented evidence that Francois was convicted of the robbery
at Zachary's apartment as well as numerous other offenses, including two felony
convictions involving drug possession.  21 RR 124-25; SX 96, 97.  As a result,
counsel could not challenge the fact that the robbery occurred, but could
plausibly lessen the impact of a seemingly random home invasion by attacking
the circumstances of the robbery and impeaching Zachary's credibility.  Indeed,
West's testimony potentially lessened Francois's culpability for the Zachary
robbery in the eyes of the jury by explaining that he did not have a gun and had

23

previously attempted peacefully to obtain the money that Zachary owed to him. West's testimony also dispelled the impression that Zachary was a random, innocent victim, but instead was drug dealer who had conned West and Francois out of the proceeds of a conspiracy to sell drugs.

In an affidavit submitting during Francois's state habeas proceedings, trial counsel further elaborated on the strategic decision to present West's testimony:

> After a review of the record, it is abundantly clear that the state's case on the merits was overwhelming against Mr. Francois. We were left with the arduous task of confronting the evidence in the punishment phase with the hope of attacking the state's witness' credibility and somehow lessen [Francois]'s culpability. Our investigation gave us info that Ms. Zachary was less than forthcoming. It was not enough to present to the jury that her former lover, Russell was a federal prisoner as a result of a drug conviction. [Francois] provided us with info, and West confirmed, that Russell and Zachary conned them out of their proceeds from a conspiracy to deliver drugs. The jury was aware of the violent facts of the underlying offense, as well as [Francois]'s convictions for drug dealing. There was no additional harm to reveal the illicit nature of the existing relationship between Zachary, Russell, Francois, and West. The jury was made aware that Zachary did not reveal that she slept with a drug dealer, and if they further believed (through West) that she was not a "random and innocent victim,' Francois's culpability in this offense could have been reduced (as it relates to their evidence of an extraneous aggravated robbery via home invasion).

SHCR at 78-79. Thus, although counsels' strategy involved acknowledging that Francois was involved in a drug transaction, the record clearly demonstrates that such decision was reasonable in light of the evidence already presented at both the guilt/innocence and punishment phases of trial.

24

The Fifth Circuit has often held that decisions regarding trial tactics cannot be the basis of an ineffective assistance of counsel claim unless counsel's tactics are shown to be "so ill chosen that it permeates the entire trial with obvious unfairness." Teague v. Scott, 60 F.3d 1167, 1172 (5th Cir. 1995)(quoting Garland v. Maggio, 717 F.2d 199, 206 (5th Cir. 1993)). Again, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690-91. Here, counsel made the strategic decision to allow the jury to hear additional testimony that Francois was involved in the drug business in light of the fact that overwhelming evidence had already been presented concerning his violent criminal record and convictions, which included drug possession. Counsel simply chose to allow the jury to hear this "damaging" testimony in order to reduce Zachary's credibility and Francois's culpability concerning the robbery. Because this was a reasonable trial strategy, Francois cannot demonstrate that his counsel's performance was deficient, and his claim should therefore be denied. Strickland, 466 U.S. at 697.

Regardless, even if counsel's performance can somehow be considered deficient for presenting the above-described testimony, no reasonable probability exists that this particular evidence affected the outcome of Francois's trial. Id. at 694 (holding that a constitutional violation of a petitioner's Sixth Amendment right to counsel is not proven unless it is shown that there is a reasonable probability that counsel's deficient performance affected the outcome of the proceedings). Interestingly, Francois offers no explanation as to how the introduction of West's testimony somehow affected the outcome of his

25

punishment. But in light of the fact that the jury already knew that Francois had been previously convicted of drug offenses, it is easy to understand why. Moreover, the jury was presented with a virtual laundry list demonstrating Francois's lengthy history of violence and criminal conduct, which included the horrendous facts of the multiple murders presented at the guilt/innocence phase. See "Evidence Relating to Punishment," supra.

As a result of this overwhelming evidence establishing Francois's future dangerousness, it is highly unlikely that the outcome of the proceedings would have been different had West's testimony been absent. Again, where the evidence of future dangerousness is overwhelming, it is virtually impossible to establish Strickland prejudice. See Strickland, 466 U.S. at 698 (finding no prejudice due to State's overwhelming evidence on aggravating factors supporting the death penalty); Ladd v. Cockrell, 311 F.3d 349, 360 (5th Cir. 2002)(finding that where the evidence of future dangerousness is overwhelming, it is virtually impossible to establish Strickland prejudice); Jones v. Johnson, 171 F.3d 270, 277 (5th Cir. 1999) (finding no prejudice due to brutal facts of murder); Russell v. Lynaugh, 892 F.2d 1205, 1213 (5th Cir. 1989) (finding no ineffective assistance "[g]iven the weakness of such testimony when juxtaposed with the overwhelming evidence of guilt, the horrifying nature of the crime, and the abundant impeachment material available to the State"). Because Francois fails to establish either prong of the Strickland test, his claim should be denied.

26

C.    Francois's allegation concerning counsels' failure to object to the trial court's alleged bias does not warrant habeas relief.

Francois next asserts that his counsel erred by failing to object to the trial court's demonstration of bias in favor of the State when it helped the prosecutor during the questioning of a witness by asking, "Why don't you ask her about her observation?"  Amended Pet., at 17, 42-45.  According to Francois, this one-sentence question aimed at moving the testimony along likely had "a severe impact on the jury" making it "harder for them to give credence to the presumption of innocence."  Id. at 41.  Ignoring the fact that the comment took place at the punishment phase where the presumption of innocence is no longer applicable, Francois goes on to claim that it was clearly ineffective assistance of counsel to not object, and that the Court of Criminal Appeals "said as much" in its opinion denying relief.  Id. at 42.

Initially, it must be pointed out that the Court of Criminal Appeals in no way insinuated that counsel was deficient for failing to object.  The court's opinion—which dismissed Francois's judicial bias claim for failing to object—stated instead that "the trial court's question (assuming it was improper at all) did not rise to such a level as to bear on the presumption of innocence or vitiate the impartiality of the jury."  Francois v. State, slip op. at 17.[6]  Such a statement is hardly the ringing endorsement Francois now makes it out to be.

Regardless, as discussed in greater detail in Section III below, Francois has failed to establish that any bias existed on the part of the trial court.

---

[6]    In a footnote, the court also stated that "the trial judge's 'question' might well be viewed as a gentle way of saying 'Rephrase your question, counselor.'"

Because the above comment clearly was not the result of any actual or presumed bias, counsel cannot be considered deficient for not objecting. It is well established that trial counsel are not required to make futile objections in order to be considered effective. Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994); Koch v. Puckett, 907 F.2d 524, 526 (5th Cir. 1990). Furthermore, because the evidence submitted at the guilt/innocence phase and punishment phase was simply overwhelming, Francois cannot demonstrate that the results of the punishment phase would have been different had counsel objected. See Strickland, 466 U.S. at 698 (finding no prejudice due to State's overwhelming evidence on aggravating factors supporting the death penalty); Ladd, 311 F.3d at 360 (finding that where the evidence of future dangerousness is overwhelming, it is virtually impossible to establish Strickland prejudice). Accordingly, Francois's allegation of ineffective assistance must fail because it does not satisfy either prong of the Strickland test.

      D.    Francois's allegation concerning counsels' failure to object to victim impact testimony presented at the punishment does not warrant habeas relief.

Lastly, Francois argues that he received ineffective assistance by counsels' failure to properly object to the victim impact evidence presented at the punishment phase through the rebuttal testimony of Michelle Frank, whom Shemika Patterson lived with following her release from the hospital. Amended Pet., at 17, 45-48. Frank described the changes she had noticed in Shemika following the murder of her three sisters, including her observations of Shemika having nightmares:

She has nightmares. She screams. She cries. She—once before she screamed out, "Make him stop. Please make him stop." She screamed out, "Nana, move. Nana, move."[7]

\* \* \*

She would be balled up, pulling the cover tightly, I guess, so no one could pull it off her. But I would pull and Dante would pull and finally we would get her to release it and she would be in tears.

And we would have to kind of, like, I shake her to wake her up. And once she wake up, I would let her know that, "I'm here for you. It's going to be all right. Just hold on, baby."

\* \* \*

She tends to, like—one time before she would be kind of, like—the bed is against the wall. One time before she would, like, go in the corner of the bed where she at and I would have to climb up on there and I would talk to her. And we can, you know, talk to her, me and Dante. And one time before, Dante and me—and I would try to talk her from coming out of that corner of the bed.

22 RR 133-34.

Prior to Frank testifying, the defense objected to her testimony on the grounds that it was hearsay and speculative testimony by someone who has "no training" to interpret dreams. 22 RR 106-14, 126-27. The trial court overruled counsel's objections. Id. at 114, 127-28. Francois now argues that counsel was ineffective for failing to object to this testimony as somehow being a violation of the Confrontation Clause. Amended Pet., at 17, 45-48. Yet, other than two separate, conclusory sentences, Francois offers absolutely no argument or explanation as to how this testimony amounts to a confrontation issue.

---

[7]     Frank explained that "Nana is short for Naikeshia." 22 RR 133.

Amended Pet., at 17, 45.   Thus, in addition to being procedurally barred, Francois's allegation is also waived for purposes of this proceeding.

The Fifth Circuit has repeatedly held that "issues not briefed, even if raised on appeal, are considered waived or abandoned."  Smith v. Cockrell, 311 F.3d 661, 679 n.12 (5th Cir. 2002)(citation omitted); Lookingbill v. Cockrell, 293 F.3d 256, 263 (5th Cir. 2002) ("Where a habeas petitioner fails to brief an argument adequately, we consider it waived") (footnote omitted).  There is no question Francois has waived this claim as he does not even attempt to brief the claim as a confrontation issue.   Further, under Rule 2(c) of the Rules Governing Section 2254 Cases, a petitioner is required to plead facts in support of his claims.  Conclusory allegations do not state a claim for federal habeas corpus relief and are subject to summary dismissal.  Koch, 907 F.2d at 530 ("Mere conclusory statements do not raise a constitutional issue in a habeas case."); Ross v. Estelle, 694 F.2d 1008, 1011 (5th Cir. 1983)(same); Schlang v. Heard, 691 F.2d 796, 799 (5th Cir. 1982).  Again, Francois has provided nothing but two conclusory sentences alleging that his confrontation rights have been violated. As such, his bald allegations due not warrant habeas relief.

Regardless, Francois is not entitled to habeas relief because counsels' failure to object on Confrontation Clause grounds was neither deficient or prejudicial under Strickland.  To start, it is hard to imagine how counsel could have objected to Frank's actual testimony on such grounds given that Frank was testifying in court and therefore subject to cross-examination.   Again, trial counsel are not required to make futile objections in order to be considered effective.  Clark, 19 F.3d at 966; Koch, 907 F.2d at 526.  In addition, although it

is beyond reason to believe that she could testify to actions or statements made while she was asleep,  Shemika Patterson herself was also available to testify (and did at the guilt/innocence phase).  This fact alone arguably demonstrates that no issue existed.  See California v. Green, 399 U.S. 149, 162 (1970) ("Where the declarant is not absent, but is present to testify and to submit to cross-examination, our cases, if anything, support the conclusion that the admission of his out-of-court statements does not create a confrontation problem.").

Further, the trial court already determined prior to Frank's testimony that it was admissible because it was neither speculative nor hearsay.  22 RR 114, 127-28.  As result, it would have been futile for counsel to object on yet another ground simply because they disagreed with the court's ruling.  In fact, the Supreme Court has upheld the admission of similar victim impact testimony from a care giver of a surviving victim.  Payne v. Tennessee, 501 U.S. 808, 827 (1991).  In Payne, the defendant stabbed Charisse Christopher over forty times, and also stabbed her two-year-old daughter, Lacie, and her three-year-old son, Nicholas.  Id.  Nicholas's grandmother testified how Nicholas has been affected by the murders of his mother and sister:

> He cries for his mom.  He doesn't seem to understand why she doesn't come home.  And he cries for his sister Lacie.  He comes to me many times during the week and asks me, Grandmama, do you miss Lacie?  And I tell him yes.  He says, I'm worried about my Lacie.

Id. at 814-15. The Court held that such testimony "illustrated quite poignantly some of the harm that Payne's killing had caused; there is nothing unfair about

31

allowing the jury to bear in mind that harm at the same time as it considers the mitigating evidence introduced by the defendant." Id. at 826.

Because it would have been futile to object to Frank's victim impact testimony on Confrontation Clause grounds, counsel cannot be held deficient for failing to do so. As a result, Francois fails to establish the first prong of Strickland and is not entitled to relief. Francois is similarly not entitled to relief under the second prong of Strickland because he has made no attempt to demonstrate that the results of the proceeding would have been different absent counsels' allegedly deficient conduct. Strickland, 466 U.S. at 694; see also Cupit v. Whitley, 28 F.3d 532, 537-39 (5th Cir. 1994) (finding that even if admission violates the Confrontation Clause, federal habeas corpus relief will not be granted unless the error had a substantial and injurious effect or influence in determining the jury's verdict). Such an attempt would also be futile, however, given the weight of the evidence presented against him at both the guilt/innocence and punishment phases. See Statement of Facts above; Strickland, 466 U.S. at 698 (finding no prejudice due to State's overwhelming evidence on aggravating factors supporting the death penalty). As such, Francois's allegation is wholly without merit and should be denied.

III.   Francois is Not Entitled to Habeas Relief on His Claim of Judicial Bias (Claim 9).

Francois next contends that he was denied a fair and impartial trial because the trial court commented on the weight of the evidence and demonstrated a bias in favor of the State at the punishment phase. Amended

Pet., at 37-41.  In particular, Francois complains about the following statement made by the court (in italics) during the State's redirect questioning of LaKeyda Patterson:

> STATE:      Were they having a good conversation?  What was going on?
>
> WITNESS:    I'm not sure what kind of conversation.
>
> DEFENSE:    Then it would be speculation, Your Honor.
>
> STATE:      I'll reword, Judge.  Based on the body language that you saw out there, were they doing okay together or were they not?
>
> DEFENSE:    Again, speculation, Your Honor.
>
> COURT:      Why don't you ask her about her observations?
>
> STATE:      Based on your observations of Anthony and Shemika when you looked out the window, were you able to determine what was going on?
>
> WITNESS:    It looked like a slight argument and then make up.

21 RR 102.

Francois argues that by assisting the prosecutor during its questioning of Ms. Patterson, the trial court "assumed the role of the prosecutor" and appeared to the jury to favor the State. Amended Pet., at 41.   But Francois did not object to the trial judge's question at trial, request an instruction to disregard, or file

a motion to recuse the judge due to bias.  By failing to raise any sort of objection concerning the trial court's question at trial, the Court of Criminal Appeals found that Francois forfeited his right to complain when he raised it for the first time on direct appeal.   Francois v. State, slip op. at 15-17.   As such, his allegation is now procedurally defaulted in this Court.   Regardless of the procedural bar, Francois still would not be entitled to relief because his claim is completely meritless.  Thus, relief should be denied.

      A.    The contemporaneous objection rule bars relief.

The Fifth Circuit has consistently held that the Texas contemporaneous objection rule constitutes an adequate and independent state ground that procedurally bars federal habeas review of a petitioner's claims.  Jackson v. Johnson, 194 F.3d 641, 652 (5th Cir. 1999); Sharp, 107 F.3d at 285-86; Nichols v. Scott, 69 F.3d 1255, 1280 n.48 (5th Cir. 1995).   Further, precedent clearly dictates that procedural default of a petitioner's federal habeas claim occurs where the last state court to consider a claim "clearly and expressly" dismisses it based upon a state procedural rule that provides an adequate basis for denial of relief, independent of the merits.  Coleman, 501 U.S. at 731-32; Finley, 243 F.3d at 218; Nobles v. Johnson, 127 F.3d 409, 422 (5th Cir. 1997).   The "independent" and "adequate" requirements are satisfied where the court clearly indicates that its dismissal of a particular claim rests upon a state ground that bars relief, and that bar is strictly and regularly followed by the state courts. Finley, 243 F.3d at 218.  The application of an independent and adequate state procedural bar must be honored even if the state court has, in the alternative,

reached the merits of the claim.[8]  Harris v. Reed, 489 U.S. 255, 264 n.10 (1989). Thus, where a state court has explicitly relied on a procedural bar, a state prisoner may not obtain federal habeas relief absent a showing of cause for the default and actual prejudice that is attributable to the default.  Murray, 477 U.S. at 485; Rowell v. Dretke, 398 F.3d 370, 375 (5th Cir. 2005) (recognizing that Fifth Circuit case law forecloses review of challenges to which a petitioner did not object absent a finding of cause and actual prejudice).  Here, Francois has made no attempt to make a showing of cause and prejudice in this Court. Therefore, his allegation is procedurally barred in this proceeding.

> B.   Alternatively, Francois fails to demonstrate any bias on the part of the trial court.

The Due Process Clause guarantees the right to a fair trial, "before a judge with no actual bias against the defendant or interest in the outcome of his particular case." Richardson v. Quarterman, 537 F.3d 466, 474 (5th Cir. 2008) (quoting Bracy v. Gramley, 520 U.S. 899, 905 (1997)).  Bias is not "lightly established," however, and "general allegations of bias or prejudice are insufficient to establish a constitutional violation." Id. (citing Valley v. Rapids Parish Sch. Board, 118 F.3d 1047, 1052 (5th Cir, 1997), and Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 820 (1986)).  Even if a judge is corrupt, bias is not presumed, and a petitioner must show the judge was biased in his case.  Bracy, 520 U.S. at 909.

---

[8]    A state court expressly and unambiguously bases its denial of relief on a state procedural default even if it alternatively reaches the merits of a defendant's claim.  Fisher v. Texas, 169 F.3d 295, 300 (5th Cir. 1999).

Due process requires recusal if a judge is shown to have an actual bias, Bracy, 520 U.S. at 909, or if there is an appearance of bias such that "the probability of actual bias . . . is too high to be constitutionally tolerable." Buntion v. Quarterman, 524 F.3d 664, 672 (5th Cir. 2008). The Supreme Court has only identified three conflict-of-interest type situations where a judge's failure to recuse constitutes this presumptive bias:

> (1) when the judge "has a direct personal, substantial and pecuniary interest in the outcome of the case," (2) when he "has been the target of personal abuse or criticism from the party before him," and (3) when he "has the dual role of investigating and adjudicating disputes and complaints."

Id. (quoting Bigby v. Dretke, 402 F.3d 551, 559 (5th Cir. 2005)).

In this case, Francois makes no argument that the trial court had an "actual bias" against him or an interest in the outcome of the case. Rather, he maintains that the judge's participation in the questioning of Ms. Patterson gave the appearance of bias in favor of the State. Amended Pet., at 41. Yet, the trial court's sole comment to the prosecutor during redirect examination in this case comes nowhere close to resembling the situations in which the Supreme Court has found a presumptive bias. Francois provides no evidence or argument that the judge had any "direct personal, substantial, or pecuniary interest" in the outcome of his trial, presumably because no such evidence exists. Similarly, no evidence has been presented showing that the judge was the target of any personal criticism or had a "duel role" in investigating and adjudicating disputes. Instead, Francois has taken a minor, meaningless comment by the trial court who was trying to move the questioning along and attempted to somehow show

36

that it had a "severe impact on the jury."  Amended Pet., at 41.  Nothing could be further from the truth.  As such, his claim is completely without merit, and relief should be denied.

IV.    Francois's Challenges to the Texas Death Penalty Statute Have Been Repeatedly Rejected and Do Not Warrant Federal Habeas Relief (Claims 3-8).

In claims three through eight, Francois raises an assortment of boilerplate challenges to the constitutionality of the Texas death penalty scheme, and argues that the trial court erred in denying his motions to preclude the imposition of the death penalty and hold the Texas capital sentencing scheme unconstitutional. Amended Pet., at 22-36. Although he acknowledges that these attacks at the legality of the death penalty are clearly foreclosed by binding precedent, Francois appears to ask this Court to review the merits of the claims simply because "death is different." Id. at 22, 31-32.  But Francois raised each of these challenges on direct appeal, where the Court of Criminal Appeals rejected them based on the fact that each claim had been previously raised and rejected.  Francois v. State, slip op. at 2-6.  Francois fails to establish that the state court's adjudication of these claims was either contrary to or involved an unreasonable application of clearly established federal law.  Moreover, as discussed in more detail below, each of the claims raised is wholly without merit. As a result, Francois is not entitled to federal habeas relief.

A.    As an initial matter, the majority of Francois's challenges to the
death penalty are inadequately briefed and are therefore waived.

In claim for relief number seven, Francois lists seven different challenges
to the constitutionality of the death penalty that were rejected by the trial court
and the Court of Criminal Appeals on direct appeal. Amended Pet., at 29. Yet,
besides citing a short paragraph from a recent Supreme Court case that
discusses the use of "evolving standards of decency," nothing else is provided
concerning these issues. Id. at 29-30. Francois offers absolutely no analysis or
authority to support the allegations he simply lists for the Court. As a result of
his failure to adequately brief this issue, he has waived any error on appeal.

The Fifth Circuit has repeatedly held that "issues not briefed, even if
raised on appeal, are considered waived or abandoned." Smith, 311 F.3d at 679
n.12; Lookingbill, 293 F.3d at 263 ("Where a habeas petitioner fails to brief an
argument adequately, we consider it waived.") (footnote omitted). Under Rule
2(c) of the Rules Governing Section 2254 Cases, a petitioner is required to plead
facts in support of his claims. In addition, conclusory allegations do not state a
claim for federal habeas corpus relief and are subject to summary dismissal.
Koch, 907 F.2d at 530; Ross, 694 F.2d at 1011. Other than listing the claims
that had been previously presented to the state court, however, Francois has not
provided any argument, analysis, or authority to support his bald assertions. As
such, he is not entitled to relief on any of the claims raised in claim seven.

38

B.     The Texas death penalty statute is not rendered unconstitutional by the failure of the mitigation special issue to explicitly allocate a burden of proof.

In his first challenge to the Texas death penalty system, Francois asserts that Article 37.071 is unconstitutional because it fails to place the burden of proof on the State regarding aggravating evidence.  Amended Pet., at 22 (claim 3), 29 (claim 7(a)).  Citing Apprendi v. New Jersey, 530 U.S. 466 (2000), Francois contends that the statute fails to require the State to prove the lack of sufficient mitigating circumstances before the mitigation special issue may be answered in the negative.  Id.  As discussed below, however, the special issues submitted to Francois's jury were more than adequate to satisfy constitutional sentencing requirements.

In Apprendi v. New Jersey, the Supreme Court held that any facts triggering the application of an enhancement statute must be submitted to the jury and proven beyond a reasonable doubt.  530 U.S. at 490.  Two years later, in Ring v. Arizona, the Court applied this principle to capital cases, holding that a jury must determine the existence of any aggravating factors necessary to impose the death penalty and those factors must be proven beyond a reasonable doubt.  536 U.S. at 609.  Simply put, Texas law does not contravene Ring because the absence of sufficient mitigating circumstances is neither an element of capital murder nor an aggravating fact that increases the punishment for capital murder.  Rather, the presence of sufficient mitigating circumstances is simply a mitigating fact that allows the defendant to escape the maximum penalty.

As the Court explained in Tuilaepa v. California, a criminal defendant's death eligibility requires the jury to "convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase." 512 U.S. 967, 972 (1994). "The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)." Id. A further caveat is that aggravating circumstances may not apply to every convicted murderer. Id. In requiring prosecutors to prove beyond a reasonable doubt any aggravating factor that increases a punishment above a statutory maximum penalty, the Supreme Court seamlessly harmonizes its Sixth Amendment Apprendi/Ring analysis with its well-established Eighth Amendment Tuilaepa jurisprudence. Those principles were not breached in Francois's case, where the aggravating circumstances in question was the future dangerousness special issue, as well as the fact that Francois murdered more than one person during the same criminal transaction. Neither is applicable to every murderer, and the trial court submitted both to Francois's jury which the State proved beyond a reasonable doubt.[9]

The mitigation special issue, on the other hand, is neither an element of capital murder nor an aggravating circumstance under Tuilaepa. Rather, the question affords the jury an opportunity to make an individualized determination of the offender's moral culpability, which Eighth Amendment

---

[9] During the punishment phase of capital trials, juries are specifically instructed that the State bears the burden of proof as to future dangerousness special issue only. Tex. Code Crim. Proc. art. 37.071 § 2(c); IV CR 839-45. Contrary to Francois's concerns, however, nothing suggests that a capital defendant has the burden to "disprove the existence of aggravating factors."

requires.  See Penry v. Johnson, 532 U.S. 782 797 (2001) (Penry II)(explaining that, the only way to ensure that the jury has made an individualized determination that death is the appropriate sentence for a particular defendant is to give the jury a "vehicle" by which to fully consider any mitigating circumstances before rendering its sentencing determination) (citing Penry v. Lynaugh, 492 U.S. 302, 319, 328 (1989)(Penry I));  Eddings v. Oklahoma, 455 U.S. 105, 113-14 (1982); Woodson v. North Carolina, 428 U.S. 280, 304 (1976). The Supreme Court has also explained that such a determination need not be structured in any particular way, as long as the jury is allowed to judge for itself what is mitigating and in what way.  Franklin v. Lynaugh, 487 U.S. 164, 179 (1988); Mills v. Maryland, 486 U.S. 367, 373-75 (1988).

This constitutionally-mandated function is served by Texas's mitigation special issue question, under which the jury is required to consider all of the evidence—the circumstances of the offense, the defendant's character and background, and the defendant's general moral culpability—but is not required to agree on what specific evidence is sufficiently mitigating to justify a life sentence rather than death by lethal injection. Tex. Code Crim. Proc. art 37.071 § 2(e) & (f); see also IV CR 839 (instructing Francois's jury they need not agree on what evidence supports an affirmative finding).  Texas juries therefore have ample ability to show leniency and reduce the defendant's ultimate sentence to life imprisonment.  See Penry II, 532 U.S. at 803 (approving the "brevity and clarity" of the current mitigation special issue as a catchall mitigation

instruction).   Because this is all that the Constitution requires, Francois's allegation must fail.

C.     Bush v. Gore[10] does not justify habeas relief for Francois.

Francois also claims that the Texas death penalty scheme is unconstitutional because the decision as to which defendant will be subjected to the death penalty varies from county to county, making the decision "arbitrary and capricious."  Amended Pet., at 23-25 (claims 3, 5).  Citing Bush v. Gore, Francois argues that by allowing the prosecutors in each of the 254 counties of Texas to develop their own system for determining when to seek the death penalty, individuals charged with capital offenses are denied equal protection under the law.  Id.  But Francois's concern over the discretion placed in the hands of the district attorneys' offices is misplaced.

The Supreme Court has held that "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision, whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."  Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978).  The Fifth Circuit more recently reemphasized that "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision, whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."  In re United States of America, 397 F.3d 274, 284 (5th Cir. 2005) (citation omitted); see also McCleskey v. Kemp, 481 U.S. 292, 296, 297 (1987)

---

[10]     531 U.S. 98 (2000).

(recognizing a prosecutor's "traditionally 'wide discretion,'" and that "discretion is essential to the criminal justice process").  This discretion is tempered only by the Equal Protection Clause.  Id.; see also United States v. Armstrong, 517 U.S. 456, 464 (1996).   Selectivity in prosecution does not amount to a federal constitutional violation as long it is not based on an arbitrary classification, such as race or religion.  Hayes, 434 U.S. at 357; Armstrong, 517 U.S. at 464.

Here, Francois makes no allegation that the prosecution sought the death penalty against him because of his race or ethnicity, nor does he claim that the Texas death penalty scheme's lack of standards leads prosecutors to discriminate on the basis of a suspect class.  See Kadrmas v. Dickinson Public Schools, 487 U.S. 450, 457 (1988).  Indeed, the Supreme Court has never held that capital murderers constitute a suspect class, and has even indicated otherwise.  See Gregg v. Georgia, 428 U.S. 153, 187-88 (1976) (holding that the decision to authorize capital punishment for some classes of crimes was one that was best left to the legislature unless "clearly wrong").   Francois simply makes the conclusory assertion that leaving the decision of whether or not to seek the death penalty up to the prosecutors in various counties somehow leads to the "arbitrary and capricious" imposition of the death penalty. Amended Pet., at 24. But if a suspect classification is not implicated, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985). Given that prosecutorial discretion is essential

43

to the criminal justice process,  McCleskey, 481 U.S. at 297, Francois cannot satisfy this standard.

By citing Bush, Francois appears to liken the collective rights of a State's citizens in a uniform method of counting their ballots to a convicted murderer's interest in avoiding the death penalty, a rationale which strains all credulity. The concern of the Bush Court was not with the discretion afforded to local entities, but with the manner in which the state court intervened to create uniformity across the state.  531 U.S. at 109.  Further, if the different subject-matter itself and the disparate procedural postures were not enough, the Supreme Court limited its consideration of equal protection to the particular facts of that case.  Id. ("Our consideration is limited to the present circumstances, for the problem of equal protection in election processes generally presents many complexities").  Thus, Francois's stretch of Bush to his situation is wholly irrelevant: the Texas courts have not crafted statewide standards to limit prosecutorial discretion in seeking the death penalty, and the concerns in Bush are inapplicable.

Francois's claim boils down to nothing less than an argument that the exercise of any discretion by prosecutors regarding whether to seek the death penalty in a capital case is inherently discriminatory.  But absent a showing of invidious discrimination and discriminatory purpose, neither the Supreme Court's opinion in Bush nor any other Supreme Court precedent deprives a prosecutor of the traditional discretion to determine (1) whether to prosecute a particular accused for a particular offense when probable cause to believe the

accused has committed that offense exists, and (2) what sentence authorized by law should be sought for a defendant convicted of such an offense. Armstrong, 517 U.S. at 466-66. As such, his claim for relief should be denied.

    D.    **The Constitution does not require jurors to be instructed regarding the effect of a single negative vote to the special issues.**

Francois next submits that the Texas capital punishment scheme is unconstitutional because it fails to inform the jury regarding the consequences of a single holdout juror on any of the special issues. Amended Pet., at 25-27, 29 (claims 4, 7(f), 7(g)). Specifically, he contends that the Eighth and Fourteenth Amendments require jurors to be instructed that a life sentence is automatically imposed if the jury is unable to respond unanimously to the special issues. Otherwise a jury's inability to reach a verdict on the special issues might generate confusion and create a danger that confused jurors would acquiesce to the "majority rules mentality" rather than hold out. Id. As a result, he argues that the "12-10" rule itself violates the principles of the Eighth and Fourteenth Amendments that protect him from cruel and unusual punishment. Yet, the Supreme Court has explicitly rejected the theory that the Eighth Amendment requires jurors to be instructed as to the consequence of their failure to agree. Jones v. United States, 527, U.S. 373, 381 (1999).

In Jones, the Court first noted that the petitioner's requested instruction—informing the jury regarding the consequences of a deadlock—was not essential to either of the functions constitutionally required in all capital sentencing schemes. That is, the instruction had no bearing on the "eligibility

decision" of the sentencing process, nor did the failure to issue such an instruction prevent the jury from broadly inquiring into all constitutionally mitigating evidence, as required to make the "selection decision." Id. at 381. The Court also rejected the idea that the trial court, by neglecting to inform a jury regarding the consequences of its failure to reach a verdict, "affirmatively mislead[s] [the jury] regarding its role in the sentencing process." Id. at 281-82. The Court reasoned that an instruction informing the jury that a life sentence would be imposed if it could not reach a unanimous verdict had no bearing on the jury's role in the sentencing process. Id. Rather, such an instruction "speaks to what happens in the event that the jury is unable to fulfill its role—when deliberations break down and the jury is unable to produce a unanimous sentence recommendation." Id.

At the state court level, Francois attempted to support his assertion by claiming that Mills v. Maryland, 486 U.S. 367 (1988), established that a constitutional violation occurs under the Texas scheme because reasonable jurors instructed pursuant to Article 37.071 are led to believe that ten jurors must agree to a "negative" response to a special issue in order to give effect to any mitigating circumstance. Thus, if only one juror was inclined to vote negatively in response to one of the special issues, it would be reasonable for that juror to conclude that his/her vote was meaningless and of no value unless nine other jurors joined them. He further submits that this creates an impermissible

risk that such jurors will succumb to "majority rule" rather than hold out. However, Francois's reliance upon Mills is misplaced.[11]

In Mills, the Court reversed the death sentence because the jury instructions may have precluded the jury from considering mitigating evidence unless all twelve jurors agreed on the existence of a particular circumstance supported by that evidence. 486 U.S. at 384. "[E]ach juror [must] be permitted to consider and give effect to mitigating evidence when deciding the ultimate question of whether to vote for a sentence of death." McKoy v. North Carolina, 494 U.S. 433, 442-43 (1990). But the Texas statutory scheme is materially distinguishable from the capital punishment statute that yielded the unconstitutional jury instruction in Mills. Whereas the Maryland jury deciding punishment in Mills was required to first determine the existence of specific mitigating factors before giving them effect by balancing them against the aggravating factors present, jurors in the instant case were permitted to individually take into account any mitigating circumstance when casting their vote on the special issues. See Jacobs v. Scott, 31 F.3d 1319, 1328-29 (5th Cir. 1994). That is, one juror could not preclude the entire jury from considering a mitigating circumstance. Thus, Mills is inapplicable. Id.

Further, the plain language of the jury instruction in the instant case does not support Francois's concern that a reasonable juror would believe that an

---

[11]   See Alexander v. Johnson, 211 F.3d 895, 897 (5th Cir. 2000) (specifically rejecting both Fourteenth and Eighth Amendment challenges to the Texas "12-10" rule); Miller v. Johnson, 200 F.3d 274, 288-89 (5th Cir. 2000) (holding Mills inapplicable to a Texas capital sentencing proceeding).

individual negative response was meaningless unless accompanied by similar responses from nine other jurors.  The jury instructions clearly stated that the jury could not answer the first special issue "yes" unless they agreed unanimously, and explained that the ten jurors needed for a "no" answer "need not agree on what particular evidence supports a negative answer" to the issue. IV CR 839.  Similarly, the jurors were instructed that they could not answer the second special issue "no" unless they agreed unanimously, and explained that the ten jurors needed for a "yes" answer "need not agree on what particular evidence supports an affirmative finding."   Id.   With this knowledge, a reasonable juror could deduce, at a minimum, that a jury verdict for a death sentence required unanimity, which one single "no" vote could defeat.  Thus, even without the specific knowledge that the effect of a single "no" vote would result in the automatic imposition of a life sentence, a juror could reasonably find value and meaning in his or her individual vote.

Because neither the Eighth Amendment nor the Fourteenth Amendment necessitates a jury instruction regarding the consequences of a jury's inability to reach a unanimous verdict during capital sentencing hearings, this claim must fail.  Furthermore, even if this claim had merit, the Fifth Circuit has repeatedly held that a claim challenging the "12-10" rule is barred under the non-retroactivity principle of Teague v. Lane, 489 U.S. 288, 310 (1989).  Hughes v. Dretke , 412 F.3d 582, 594 (5th Cir. 2005) (holding extension of the rule in Mills to Texas is foreclosed by Teague); Alexander, 211 F.3d at 897; Webb v.

Collins, 2 F.3d 93, 95-96 (5th Cir. 1993).  Francois has not, therefore, stated a ground upon which this Court may grant relief, and this claim must be denied.

> E.     Predictions of future dangerousness under the second special issue do not violate the Constitution.

In his sixth claim for relief, Francois argues that the Texas death penalty scheme is unconstitutional due to the jury's "inability to predict future dangerousness." Amended Pet., at 28.  Relying on a paper from the American Psychiatric Association (APA) from 1974, Francois contends that "the unreliability of psychiatric predictions of long-term future dangerousness is by now an established fact within the profession." Id.  Because the future dangerousness special issue has repeatedly been upheld by the Supreme Court, however, Francois cannot demonstrate that he is entitled to any relief. Moreover, relief would be barred by the non-retroactivity doctrine of Teague.  As a result, his claim should be denied.

Under the future dangerousness special issue, the State must prove beyond a reasonable doubt that there is a probability that Francois would commit criminal acts of violence that would constitute a continuing threat to society.  IV CR 846.  This issue is part of the Texas capital-punishment scheme that has been repeatedly upheld by the Supreme Court and continues to withstand constitutional scrutiny.  Johnson v. Texas, 509 U.S. 350, 373 (1993); Franklin, 487 U.S. at 164; Jurek v. Texas, 428 U.S. 262, 272-74 (1976); see also Scheanette v. Quarterman, 482 F.3d 815, 827-28 (5th Cir. 2007) (special issue is not so vague as to require additional instruction or definition by the court)

49

(citing Woods v. Johnson, 75 F.3d 1017, 1033-34 (5th Cir. 1996)).  Nothing cited by Francois purporting to demonstrate the inaccuracies of future danger predictions would be sufficient to cast doubt upon the validity of the Supreme Court's decisions ultimately holding that the Texas death-penalty system is constitutionally adequate.

Indeed, the Supreme Court addressed whether evidence of future dangerousness was inherently unreliable in Barefoot v. Estelle, 463 U.S. 880 (1983), a case wherein the APA submitted an amicus brief.  Amended Pet., at 28. In Barefoot, the petitioner argued that evidence of future dangerousness was unreliable, and that introducing into evidence the answers to hypothetical questions made by a psychiatrist who had not personally examined the defendant was erroneous.  The Court did not agree, and specifically refused to convert the APA's condemnation of psychiatric predictions of future dangerousness into a constitutional rule barring an entire category of expert testimony.  Barefoot, 463 U.S. at 899; see also Estelle v. Smith, 451 U.S. 454, 473 (1981) (same view rejected by Court, stating that it was in "no sense disapproving the use of psychiatric testimony bearing on future dangerousness.").

Furthermore, to the extent that this Court would find that Francois's claim has potential merit, it still would require the announcement and retroactive application of a new rule of constitutional law in violation of Teague

v. Lane, supra.  Under Teague, new rules of constitutional criminal procedure[12] will not be announced on federal habeas review and then retroactively applied unless an exception applies.  489 U.S. at 301; Caspari v. Bohlen, 510 U.S. 383, 389-90 (1994).  The first exception to Teague's retroactivity limitation is for rules that would place primary conduct beyond the government's power to proscribe or a class of persons beyond its power to punish in certain ways.  Graham v. Collins, 506 U.S. 461, 477 (1993).  The second Teague exception is reserved for bedrock rules of criminal procedure that are necessary to ensure a fundamentally fair trial.  Id.

Francois's requested relief without question calls for a new rule of constitutional law because, in Barefoot, the Supreme Court expressly and unambiguously rejected the petitioner's contention that expert testimony on future dangerousness must be based on a personal examination of a defendant and may not be given in response to hypothetical questions.  463 U.S. at 903.  For this Court to now hold to the contrary would establish a new rule in violation of Teague.  But Francois fails to establish that the relief he requests falls under either exception to Teague's retroactivity limitation.[13]  The proposed new rule certainly is not the type of rule contemplated by the Court's first Teague exception, and Francois cannot meet Teague's second exception because

---

[12]    "[A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or on the federal Government . . . To put it differently, a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final."  Teague, 489 U.S. at 301.

[13]    Indeed, he fails to even discuss Teague.  Amended Pet., at 28.

51

his proposed rule would not be "implicit in the concept of ordered liberty." Teague, 489 U.S. at 313; see also Graham v. Collins, 506 U.S. at 477 (second Teague exception is reserved for bedrock rules of criminal procedure which are necessary to ensure a fundamentally fair trial).  As such, Francois's allegation is unquestionably barred by the non-retroactivity principle of Teague, and relief should be denied.

      F.    The Texas capital punishment scheme does not permit the type of "open-ended" discretion prohibited under the Eighth and Fourteenth Amendments.

Without any briefing, Francois next claims that the Texas death penalty scheme, as currently administered, is unconstitutional because it "permits the very type of open-ended discretion condemned in Furman v. Georgia [408 U.S. 238 (1972)]."  Amended Pet., at 29 (claim 7(b)).  Francois also cites Justice Blackmun's dissent in Callins v. Collins, 510 U.S. 1141 (1994), to argue that the Texas capital punishment scheme should be declared unconstitutional because, in its current form, the death penalty is not fairly administered with reasonable consistency.  Id.  Similar to his other challenges to the death penalty, however, Francois's failure to refute the reasonableness of the state court's adjudication of this claim precludes him from obtaining federal habeas relief.

To pass constitutional muster, a capital punishment system must be "at once consistent and principled but also humane and sensible to the uniqueness of the individual."  Eddings, 455 U.S. at 110.  Explained further, a system must "channel the [capital] sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance' and that 'make rationally

reviewable the process for imposing a sentence of death.'" Franklin, 487 U.S. at 181(quoting Godfrey v. Georgia, 446 U.S. 420, 428 (1980)).  Sentencers must not have unbridled discretion when determining a defendant's fate, nor may the death penalty be administered in an "arbitrary and unpredictable fashion." Franklin, 487 U.S. at 181(citing California v. Brown, 479 U.S. 538, 541 (1987)).

Although Francois may believe that these twin objectives of limited discretion with individualized sentencing are practically impossible to achieve, his claims must fail.  Indeed, the Supreme Court has repeatedly held that the Texas capital sentencing scheme is constitutionally sound.  Johnson, 509 U.S. at 373; Franklin, 487 U.S. at 164; Jurek, 428 U.S.  at 262.  Specifically, the Court has stated that "we have previously recognized that the Texas Special Issues adequately 'allo[w] the jury to consider the mitigating aspects of the crime and the unique characteristics of the perpetrator, and therefore sufficiently provid[e] for jury discretion.'" Franklin, 487 U.S. at 182 (quoting  Lowenfield v. Phelps, 484 U.S. 231, 245 (1988)).  The Texas scheme ensures that the sentencer will have adequate guidance when determining sentencing because it authorizes the defense to present to the jury, in a separate hearing, any relevant mitigating circumstance related to the defendant.  Johnson, 509 U.S. at 363.  The Texas special issues system therefore guides "the jury's consideration of the mitigating evidence while still providing for sufficient jury discretion." Id. at 364.

Importantly, under the Texas scheme, a capital defendant is considered death eligible once convicted of capital murder during the guilt-innocence phase. See Woods, 307 F.3d at 359.  The discretion that exists during the punishment

phase under the mitigation special issue was designed to give the jury "open-ended" discretion to not impose the death sentence.  The jury in the present case was instructed under the revised Article 37.071 (2)(e)(1),which now requires the jury to decide whether, "taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Anthony Quinn Francois, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed."  IV CR 847.  This instruction was crafted pursuant to legislative changes resulting from the Supreme Court's decision in Penry I, see also Cockrell v. State, 933 S.W.2d 73, 92-93 (Tex. Crim. App. 1996), and was approved, at least implicitly, by the Supreme Court in Penry II, when the Court noted that

> [a] clearly drafted catchall instruction on mitigating evidence also might have complied with Penry I. Texas' current capital sentencing scheme (revised after Penry's second trial and sentencing) provides a helpful frame of reference. ... Penry's counsel, while not conceding the issue, admitted  that he "would have a tough time saying that [Penry I] was not complied with under the new Texas procedure."

532 U.S. at 803.

In light of these holdings, it is impossible for Francois to show that the state courts unreasonably applied clearly established federal law in finding that his death sentence was constitutionally imposed.  Francois is simply complaining about discretion in the Texas system that is actually designed and aimed to work entirely to his benefit.  Regardless, even if this Court were inclined to accept Francois's arguments, federal habeas relief on these claims is again foreclosed

under the principles of Teague.  For this reason, and those stated above, Francois is not entitled to federal habeas relief.

      G.    Francois is not constitutionally entitled to a proportionality review of the jury's decision to impose a death sentence.

Francois's next allegation asserts that the Texas death penalty scheme is unconstitutional because it does not permit meaningful appellate review. Amended Pet., at 29 (claim 7(c)).  However, it is clear under Fifth Circuit and Supreme Court precedent that the Constitution does not mandate a comparative proportionality review of a death sentence.   As such, Francois cannot demonstrate that the state court's adjudication of this claim was either contrary to or involved an unreasonable application of clearly established federal law, and his request for federal habeas relief on this claim should be denied.

Initially, to the extent that Francois is asserting that no sufficiency of the evidence review is available under the current law, he is plainly wrong because the Court of Criminal Appeals regularly reviews the legal sufficiency of the State's evidence of future dangerousness.  See Reese v. State, 33 S.W.3d  238, 245 (Tex. Crim. App. 2000).  Further, to the extent that Francois believes that his due process rights are being violated by the Court of Criminal Appeals's failure to review the sufficiency of the jury's answer to the mitigation special issue, his claim still fails because the sufficiency of such evidence is not a matter for appellate review.  The Supreme Court has held that meaningful appellate review of death sentences is crucial to the preservation of a fair and just system of capital punishment.  Parker v. Dugger, 498 U.S. 308, 321 (1991); Clemons v.

Mississippi, 494 U.S. 738, 749 (1990). However, Supreme Court jurisprudence distinguishes between a jury's "eligibility decision," in which the jury must convict the defendant of murder and find at least one aggravating circumstance, and its "selection decision," in which the jury must determine whether a defendant who is eligible for the death penalty should, in fact, receive it. Tuilaepa, 512 U.S. at 972-73. The Court further recognized that "separate requirements" apply to each decision. Id. at 972. The "eligibility decision" must be made with "maximum transparency" so as to make the process for imposing the death penalty "rationally reviewable." Id. at 973. On the other hand, the "selection decision" requires "individualized sentencing and must be expansive enough to accommodate relevant mitigating evidence so as to assure an assessment of the defendant's culpability." Id.

In Texas, the "eligibility decision" is made at guilt-innocence where the trier of fact determines whether to convict the defendant of capital murder. See Woods v. Cockrell, 307 F.3d 353, 359 (5th Cir. 2002). Once the defendant is convicted, or determined to be "death eligible," the jury then answers the statutory punishment issues and decides whether that defendant receives the death penalty or life imprisonment. During this selection process, the sentencing jury is "free to consider a myriad of factors to determine whether death is the appropriate punishment." California v. Ramos, 463 U.S. 992, 1008 (1983). Indeed, the Supreme Court has authorized "unbridled discretion" in the jury's determination of whether to impose the death penalty. Zant v. Stephens, 462 U.S. 862, 875 (1983).

Such unfettered discretion assures a capital defendant that the punishment imposed is "an individual determination on the basis of the character of the individual and circumstances of the crime." Id. at 879. That is, the jury is free to hear, consider, and give effect to all relevant evidence before assessing such a severe penalty. As such, there is no restriction on the jury's ability to extend mercy and choose not to sentence a defendant to death. Requiring an appellate court to second-guess a jury's subjective determination of extenuating circumstances would inevitably result in courts prioritizing certain mitigating factors over others and, therefore, restricting a sentencing jury's capacity to individually assess the circumstances and situation of each defendant in violation of the Supreme Court's directive.

Thus, although a capital defendant is entitled to "meaningful appellate review" of a death sentence under the Eighth and Fourteenth Amendments, appellate courts are not required to conduct an independent review of the jury's mitigation finding. Pulley v. Harris, 465 U.S. 37 (1984) (rejecting an argument that the Constitution required states to conduct a comparative proportionality review of a death sentence); Parker, 498 U.S. at 321 (holding that the Constitution does not require appellate review of punishment evidence). Indeed, the Supreme Court has explained:

> an appellate court, unlike a capital sentencing jury, is wholly ill-suited to evaluate the appropriateness of death in the first instance. Whatever intangibles a jury might consider in its sentencing determination, few can be gleaned from an appellate record. This inability to confront and examine the individuality of the defendant would be particularly devastating to any argument for consideration of what this Court has termed "[those] compassionate or mitigating

factors stemming from the diverse frailties of humankind." When we held that a defendant has a constitutional right to the consideration of [mitigating] factors...we clearly envisioned that that consideration would occur among sentencers who were present to hear the evidence and arguments and see the witnesses.

Caldwell v. Mississippi, 472 U.S. 320, 330-31 (1985)(internal citations omitted)(emphasis added).

Accordingly, the Fifth Circuit has emphatically upheld the constitutionality of Texas courts' refusal to review the sufficiency of mitigating evidence.    Hughes v. Johnson, 191 F.3d 607, 621-22 (5th Cir. 1999)(citing Pulley, 465 U.S. at 37); Moore v. Johnson, 225 F.3d 495, 507 (5th Cir. 2000) ("Texas followed Supreme Court instruction to the letter.  No court could find that Texas had acted contrary to federal law as explained by the Supreme Court, and no benefit will arise from further consideration of the obvious.").  Circuit precedent also holds that the absence of mitigation sufficiency review does not violate constitutional concerns because the state appellate court satisfies federal constitutional requirements when it provides a meaningful review of the evidence supporting the future dangerousness special issue.  Beazley, 242 F.3d at 261.

Finally, because appellate review of mitigating evidence has never been required, any recognition of Francois's claim on federal habeas review would require the announcement and retroactive application of a new rule of constitutional law in violation of Teague.  For these reasons, the state court's adjudication of this claim was reasonable, and this Court should refuse

58

Francois's barebones request to require the lower court to review the sufficiency of the evidence to support the jury's answers to the special issues.

> H.    The mitigation special issue does not unconstitutionally limit the jury's consideration of evidence at the punishment phase.

Francois challenges the constitutionality of Texas's statutory definition of mitigating evidence, arguing that it impermissibly restricts the jury's ability to consider certain evidence by limiting the concept of mitigating evidence to only evidence which reduces moral blameworthiness. Amended Pet., at 29 (claim 7(d)).    Again, Francois's allegation is contrary to clear Fifth Circuit and Supreme Court precedent.   As such, he cannot establish that state court's decision was either contrary to, or involved an unreasonable application of, clearly established federal law, and this claim should be denied.

The Supreme Court has consistently held that the mitigating value of constitutionally relevant evidence, as actually proffered during trial, must be within "the effective reach" of the jury in responding to the statutory punishment issues and instructions.  Tennard v. Dretke, 542 U.S. 274, 285 (2004) (citing Boyde v. California, 494 U.S. 370, 377-378 (1990)); Johnson v. Texas, 509 U.S. at 368; Graham, 506 U.S. at 475.  However, the Constitution does not require unfettered sentencing discretion in the jury, and a state may guide the sentencer's consideration of mitigating evidence in an effort to achieve a more rational and equitable result.  Buchanan v. Angelone, 522 U.S. 269, 276 (1998); Tuilaepa, 512 U.S. at 971; Johnson, 509 U.S. at 362.  Thus, there is no requirement that a jury be allowed to give effect to mitigating evidence in every

conceivable manner in which the evidence might be relevant. Johnson, 509 U.S. at 372. If mitigating evidence is within the effective reach of the jury, the fact that a defendant can identify mitigating value beyond the scope of the statutory issues does not require the submission of an additional issue or instruction allowing the jury to give further mitigating effect to the evidence. Id.; Graham, 506 U.S. at 474; see also Boyde, 494 U.S. at 382 n.5 (defendant is entitled only to a fair vehicle by which sentencer can give effect to mitigating force of his evidence).

Further, mitigating evidence is beyond the effective reach of the sentencer only if there exists a "reasonable likelihood that [the] jurors would have deemed themselves foreclosed from considering [the mitigating evidence]" in answering the special punishment issues submitted to the jury. Johnson, 509 U.S. at 369 (emphasis added); see Penry I, 492 U.S. at 315-29 (jury was prevented from giving any mitigating effect to the evidence). The defect identified in Penry I and again in Penry II was that the jury was prevented from giving any mitigating effect to the evidence. See Tenard, 542 U.S. at 288-89; Saffle v. Parks, 494 U.S. 484, 489 (1989); Penry II, 532 U.S. at 800. This defect did not occur in Francois's case, nor does he make any attempt to explain what evidence he believes the jury could not consider.

The fact that a jury ultimately concludes that none of the evidence presented was sufficient to reduce moral blameworthiness does not mean that the jury was precluded from considering such evidence. The Supreme Court recognized in Skipper v. South Carolina that not everything a defendant

60

introduces in mitigation of punishment is "relevant mitigating evidence." 476 U.S. 1, 7 n.2 (1986). Evidence of a defendant's character or background attains constitutionally mitigating relevance to his culpability for the crime only if it reflects a reduced culpability, i.e., that the capital murder is to some degree attributable to those aspects of his character or background proffered in mitigation of punishment:

> [E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse . . . Thus, the sentence imposed at the penalty stage should reflect a reasoned moral response to the defendant's background, character, and crime rather than mere sympathy or emotion.

Franklin, 487 U.S. at 184 (O'Connor, J., concurring) (quoting California v. Brown, 479 U.S. at 545 (emphasis in original)); see also Penry I, 492 U.S. at 319 (noting that it is well settled that "punishment should be directly related to the personal culpability of the criminal defendant . . . Thus, the sentence imposed at the penalty stage should reflect a reasoned moral response to the defendant's background, character, and crime.") (citation omitted); Saffle, 494 U.S. at 492-93 ("It is no doubt constitutionally permissible, if not constitutionally required . . . for the State to insist that the individualized assessment of the appropriateness of the death penalty [be] a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence.") (internal citations and quotes omitted).

While the jury may have found the evidence presented by Francois unpersuasive, he has failed to prove that the jury was unconstitutionally precluded from considering any of it due to the definition of mitigating evidence given by the statute.  Indeed, the Supreme Court has previously approved the mitigation special issue as currently worded, see Penry II, 532 U.S. at 803, and made no mention of fault in the supplemental instruction.  Likewise, the Fifth Circuit has upheld the validity of Article 37.071, Section (2)(f)(4).  Beazley, 242 F.3d at 248.  In that case, the court denied relief on a similar claim, finding that Article 37.071, Section (2)(f)(4) "does not unconstitutionally 'preclude [] [the jury] from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" Id. (citing Lockett, 438 U.S. at 604) (emphasis in the original).  Specifically, the court explained that "virtually any mitigating evidence is capable of being viewed as having some bearing on the defendant's moral culpability apart from its relevance to the particular concerns embodied in the Texas special issues."  Id. at 260 (citing Graham, 506 U.S. at 476)(emphasis original)).

Francois's claim simply fails to provide sufficient grounds for this Court to rule contrary to the Fifth Circuit's explicit holding in Beazley.  Regardless, even if he were able to prove the merits of his claim, federal habeas relief is Teague-barred because it would require the creation of a new constitutional rule of law.  For this and the foregoing reasons, federal habeas relief should be denied.

IV.     Francois is Not Entitled to Relief On His Allegation That He Was Denied
        Effective Assistance of State Habeas Counsel (Claim 10).

        In his final allegation, Francois argues that he was denied the effective

assistance of state habeas counsel by counsel's failure to raise certain claims in

his state habeas petition. Amended Pet., at 42-48. Specifically, Francois faults

counsel for not raising claim nine, supra, in his state habeas petition (despite the

fact that this claim was raised on direct appeal), as well as for failing to raise a

claim concerning the alleged violation of his due process rights by the erroneous

admission of victim impact evidence. Id. But, as Francois concedes, this claim

has been repeatedly rejected by the Fifth Circuit and Supreme Court because

there is no constitutional right to effective assistance of counsel during collateral

state post conviction proceedings. Further, Congress has legislatively foreclosed

relief on claims alleging ineffective assistance of either federal or state habeas

counsel. See 28 U.S.C. § 2254(i). Accordingly, Francois's assertions concerning

state habeas counsel's alleged effectiveness are not cognizable on federal habeas

review and do not warrant habeas relief.

        The Supreme Court has unwaveringly held that states are under no

constitutional obligation to provide defendants with counsel during state habeas

proceedings. Coleman, 501 U.S. at 752; Murray v. Giarratano, 492 U.S. 1, 10-11

(1989). "The right to appointed counsel extends to the first appeal of right, and

no further." Pennsylvania v. Finley, 481 U.S. 551, 555 (1987). The Court has

reasoned that, because post conviction collateral review is not mandated by the

Constitution, there is no basis upon which to compel states to afford effective

representation by counsel during those proceedings. Coleman, 501 U.S. at 752;

63

Finley, 481 U.S. at 557 ("States have no obligation to provide [post-conviction relief], and when they do, the fundamental fairness mandated by the Due Process Clause does not require that the state provide a lawyer as well.")(internal citations omitted).  Because Francois had no constitutional right to counsel during his state habeas proceedings in the first place, he cannot now claim that he is entitled to constitutionally effective counsel during the same proceeding.

Moreover, the Supreme Court has rejected the argument that the Fourteenth Amendment Due Process Clause requires state habeas counsel's representation to comport with federal constitutional standards for effective assistance simply because the state granted prisoners access to counsel on post conviction review.  Finley, 481 U.S. at 557-58.  As noted by the Court in Finley, creating such a rule would put states in the very difficult position of choosing between affording no counsel whatsoever or following strict constitutional guidelines regarding appointed counsel.  Id. at 559.  The Court further found that the collateral nature of the proceeding warrants less protection than the actual trial or first appeal as of right.  Id. at 555-56.  Thus, the Fifth Circuit has also declined to hold that the Due Process Clause requires states to ensure constitutionally effective assistance of counsel on collateral review.  Graves v. Cockrell, 343 F.3d 465, 478 (5th Cir. 2003) (rejecting the argument that "if a state chooses to appoint counsel for state habeas proceedings, its act of grace triggers a constitutional right to effective representation in those proceedings") (citing In re Goff, 250 F.3d 273, 275 (5th Cir. 2001)); Ogan v. Cockrell, 297 F.3d

64

349, 357 (5th Cir. 2002) (refusing Ogan's argument that he was entitled to effective assistance of counsel during state habeas proceedings through "the Fourteenth Amendment due process requirement that state forums and procedures be administered in a reasonably fair and consistent manner").

Although Finley and Giarratano were decided prior to the AEDPA's enactment, any attempts to argue that they are no longer applicable would be wholly without merit.  The federal statute mandating the appointment of counsel for federal habeas petitioners is not relevant to the Supreme Court's rationale in these two cases because they deal specifically with the issue of whether there exists a constitutional right to effective assistance of counsel during state habeas proceedings.  This position is further crippled by the fact that the AEDPA specifically legislates against the very relief that Francois seeks to obtain with his argument.  That is, § 2254 of this act states that "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding raised under section 2254."  28 U.S.C. § 2254(i).  Clearly Francois's claim concerning state habeas counsel's effectiveness is not a cognizable federal habeas claim and, as such, it should be denied.

## CONCLUSION

For the foregoing reasons, the Director respectfully requests that Francois's petition for writ of habeas corpus be denied, and that no Certificate of Appealability issue in this case.

Respectfully submitted,


GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division


   s/ Jeremy Greenwell
JEREMY C. GREENWELL*
Assistant Attorney General
Postconviction Litigation Division
State Bar No. 24038926

P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548
(512) 936-1600
(512) 320-8132 (Fax)
E-mail: jeremy.greenwell@oag.state.tx.us

*Lead Counsel          ATTORNEYS FOR RESPONDENT

CERTIFICATE OF SERVICE

I certify that on the 1st day of June, 2011, a true and correct copy of the above pleading was electronically served to the following counsel for Francois by filing the foregoing document with the Clerk of the Court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court.

JANI MASELLI
Attorney at Law
808 Travis St.
Houston, TX 77002
jjmaselli@aol.com

　　　s/ Jeremy Greenwell　　　
JEREMY C. GREENWELL
Assistant Attorney General